Filed 5/15/18
Reposted with correct filed date

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C081267 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F04470) |
| v. | |
| MICHAEL WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Geoffrey A. Goodman, Judge.  Reversed with directions.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Michael Williams stabbed his wife, victim Tanganyika Hoover Williams, twice in the neck, and she bled to death. The trial court permitted the People to introduce evidence at trial of defendant's then 23-year-old conviction (out of Oklahoma) for shooting with intent to kill and the circumstances thereof.

Defendant's jury found him guilty of first degree murder with personal use of a deadly weapon. The jury then found defendant sane, and the trial court found he had a prior serious felony conviction and prior strike (the 1992 Oklahoma conviction). (Pen. Code, §§ 187, subd. (a), 667, subds. (a), (b)-(i), 1170.12, 12022, subd. (b)(1).) The court sentenced defendant to prison for 50 years to life plus six years. Defendant timely appealed.

Defendant claims in part that the trial court abused its discretion when it permitted the People to introduce evidence underlying his 1992 Oklahoma conviction. As we will explain, we agree that this evidence had scant--if *any*--relevance to this case, and any relevance it did have was vastly outweighed by its potential for unfair prejudice. This evidence was heavily relied on by the prosecutor in arguing for premeditation and deliberation in what was otherwise not a strong case for first degree murder, thus the error was prejudicial.

However, because sufficient evidence (apart from the prior acts evidence) was presented in the case-in-chief to support first degree murder, we reject defendant's claims that trial counsel should have moved to acquit and that no substantial evidence supports the verdict. Therefore, a retrial on the first degree murder charge is not precluded. In light of these holdings, we do not address the many other claims raised.

## FACTS

There was no dispute that defendant killed the victim on the morning of July 8, 2014. The issues at trial were his state of mind and his sanity at the time of the killing.

*People's Case*

According to the victim's son, the victim was married to defendant for less than a year, but they had been together for three or four years. In July 2014, the victim lived with her daughter Taquita Lugo, but sometimes stayed with defendant in a van or a motel. The victim received Supplemental Security Income (SSI) and used crack cocaine off and on. Her son helped the victim move her things out of the Super 8 Motel on Sunday, July 6, 2014. She told him her marriage was in doubt, and she was going to meet defendant to discuss it. The next day at Lugo's house the victim told him she had decided to leave defendant and obtain a divorce, though she still loved defendant. Her son helped her return some clothing she had bought for defendant, and they parted at approximately 7:00 that night (July 7). After he learned the victim was dead, he found messages from defendant on a telephone answering machine at Lugo's house, in which defendant asks why the victim took his "stuff" and said he loved her.

Three witnesses saw the victim bleeding on the ground early on July 8, and testified that when asked who did this to her, she said defendant's name or that her husband did it. One of these witnesses, a peace officer, testified that the victim also told him that she had been stabbed with a "writing pen." Another testified that he returned home from work at approximately 6:00 a.m. and saw a van parked by his property, as well as a white car, saw a man and a woman interacting, and heard music playing. He woke up at 7:45 a.m. to the sound of his dogs barking, heard screaming, and found the victim on the sidewalk.

The victim had a potentially lethal amount of methamphetamine in her system, but that did not kill her. Death was caused by two stab wounds to the neck. There was a defensive cut on her left thumb and fresh blunt force injuries on her head, neck, torso, and extremities.

The victim's purse was found in defendant's van about a mile away. Methamphetamine pipes and four knives were found in the van. When defendant was

3

arrested on July 29, 2014, he had a Greyhound bus itinerary for Oklahoma City departing August 1 that had been printed on July 28. When arrested, defendant initially gave the police a false name.

A woman testified that in 1991 she lived with her mother (Betty T.) in Oklahoma. Her sister Becky W. was then married to defendant. The parties stipulated that in 1991, Becky W. was estranged from defendant and was staying with her mother, (Betty T.). One night defendant tried to bust in the door and struggled with Becky W., trying to pull her out of the house. Betty T. told defendant to leave, whereupon defendant shot Betty T. in the head. She survived.

The defense did not move to acquit after the People rested.

*Defense Case*

Defendant testified he was convicted of shooting with intent to kill arising from the 1991 Oklahoma incident, and he had served his time for that crime.

The victim here had been homeless before she began living with defendant. He was on medications (including Risperdal) to treat bipolar schizophrenia, for which he had been treated since about 2005 or 2006, although he had been diagnosed earlier in Oklahoma where he served a short stint in a locked mental institution in the 1980's. He then heard voices telling him to do things, saw shadowy figures, and had trouble holding a train of thought. The medications stopped these symptoms, although he did not always take them. When he did not take them, the symptoms would reappear. He was taking his medications while in jail. The victim, too, took psychiatric medications, but they would both stop when they were using drugs, such as methamphetamine. They had been together for three years, and married in 2013, over the disapproval of her family. They lived in motels or in his van after they were kicked out of a rental house, although for about six months they lived with the victim's daughter, Lugo. They were on SSI because of mental disability, and each received $970 per month.

4

One day defendant returned to Lugo's house to find his things packed, and he was told he was not welcome there anymore. He then stayed in motels when he had money and in his van when he had none. He and the victim had had many short breakups--a few days long--over small arguments.

In 2014, both defendant and the victim were taking their medications about half the time. They were smoking methamphetamine together a couple of times a week, spending about $100 to $150 per week on the drug.

On July 1, 2014, the victim received $10,000 in SSI back-payments. They bought a larger than usual amount of methamphetamine and began smoking it, using continuously for the next week. On July 7 the victim went to spend time with Lugo. Defendant became worried after the victim did not return telephone messages. He wondered whether they would stay together.

Defendant stayed in his van that night, and the victim arrived in her car the next morning while it was still dark. They talked and smoked drugs for about 15 or 20 minutes. At approximately 6:00 a.m. on July 8, the victim left to be with her daughter. At that point, defendant still loved her, and thought she still loved him, though he had doubts about their future. He then called and left messages at Lugo's telling the victim he was in love with her. After about an hour and a half she returned, they hugged, got in the van, and they again smoked drugs.

While in the van, defendant asked the victim if she was going to leave him, who she was leaving him for, and why she was leaving, and he became increasingly angry when she did not answer his questions. Defendant held the victim by the shoulders and asked her more of the same questions, but she just smirked at him, which inflamed him and he began shaking her. He reached down for a box cutter and put it to her throat to scare her. They struggled, she got cut, and she began to bleed. They were wrestling and rolling around inside the van, which caused her to bleed. He did not want to cut her but was "dead angry," "wasn't thinking clearly," and heard "racing thoughts in [his] mind."

He had no intent to hurt or kill her. He heard voices, one of which said "get her" and he cut the victim. She then left the van. He thought he would be accused of hurting her and left because he was scared.

On cross-examination, defendant explained that the victim was cut once, then she asked to go to a doctor and then was cut a second time--though he did not remember how that happened--and then she was cut on the thumb while fighting for her life. He knew he was a wanted man, and planned to go back to Oklahoma to escape punishment, once his August SSI money came in. He admitted lying about his name when he was arrested. He had shaved his head, but claimed he did not do it to evade arrest. When shown a videotaped interrogation in which he told a detective he did not remember when he last saw his wife, he claimed he was being truthful, as he did not regain his memory of the events until after he received his medication in jail. However, he had also told the detective that the last time he had seen the victim was a month before and he conceded that had been a lie. He admitted that he had lied through most of the interrogation, to avoid culpability, but testified he did not intend to stab the victim.

When confronted by the prosecutor with evidence of a conversation he had engaged in while in jail, defendant admitted he knew the conversation's other participant (Gwen Nance, a friend of his) and had spoken with her on the telephone while in custody. He admitted telling her he was going to beat the case, via a strategy of saying he was mentally ill and too high to know what he was doing, but he testified that was a truthful statement about his condition. Defendant knew the victim had not answered his questions, but claimed he did not know she was going to leave him when she smirked, then he became very angry and put the blade to her neck. He told Nance he had "done 15 years in the joint before," which was "hard," and he wanted to flee to Oklahoma because he was guilty; he had also told Nance that he might be facing the death penalty.

Under continued cross-examination, and contrary to his prior testimony, defendant admitted that in the van he did know the victim was going to leave him, and that he had

6

worried about that for months. He wanted a firm answer from her in the van, and responded to the prosecutor's questions:

> "Q And she said no?
>
> "A No, she didn't.
>
> "Q And she smirked at you?
>
> "A Yes, she did.
>
> "Q *And you killed her for it*?
>
> "A *Yes, I did.* (Italics added.)

Later, defendant again contradicted himself and denied that he had been worried for months about the victim leaving him. He then admitted that in the months leading to the killing, he had told his social worker several times that he was worried about the victim cheating on him. He admitted that on July 6, she took back some clothes she had bought for him, and some money she had given him. He admitted she was not returning his calls and then agreed that: "Q You were losing control of Tanganyika; correct? [¶] A Correct." She refused to commit to him in the van, and his anger was at a "ten."

On redirect defendant testified he did not intend to cut the victim, but said his plan was "[t]o get back with [his] wife." He claimed he did not see the injuries inflicted or try to cut her thumb, but on re-cross testified as follows:

> "Q Now, you said yesterday on cross after you stabbed her the first time she tried to get up and get out of the van?
>
> "A Correct. [¶] . . . [¶]
>
> "Q And you grabbed her and [kept] her from leaving; correct?
>
> "A Correct.
>
> "Q And you sat her back down; correct?

"A  That's correct.

"Q  *And you put the knife back to her throat; correct?*

"A  *Correct.*

"Q  *And you stabbed her again to get the job done; right?*

"A  *Correct.*

"Q  She wasn't dead yet; right?

"A  No, she wasn't.

"Q  *And when she fought back she put her hand up to try to block you from stabbing her again; correct?*

"A  *I believe so.*

"Q  *And that's when you cut her hand and almost cut her thumb off; right?*

"A  *Yes.*"  (Italics added.)

Dr. Gregory Sokolov, director of psychiatric services for the jail, testified about schizophrenia, schizoaffective disorder, and bipolar disorder, and the usual medications therefor.  Schizophrenics can present symptoms of psychosis including hallucinations, paranoid delusions, disorganized thinking, and lack of emotion; persons with schizoaffective disorder *also* have a mood disorder, such as major depression or bipolar disorder.  Bipolar disorder is characterized by mood swings from "full-blown mania" to depressive moods.  Some people who experience hallucinations know they are not real.

Although he had never met defendant, Dr. Sokolov had read his psychiatric records.  As early as 2009, defendant was diagnosed with schizoaffective disorder, with either bipolar or major depressive disorder, with symptoms including paranoid delusions, irritability, mood swings, panic attacks, racing thoughts, and depression, with auditory hallucinations and occasional paranoia.  Medications can help control delusions,

hallucinations, disorganized speech and behavior, but not "negative symptoms" like flat affect or lack of emotion.

Defendant had been prescribed Risperdal to treat his psychotic symptoms (delusions, hallucinations, disorganized thoughts and behaviors), Depakote to stabilize his mood swings, and sertraline, an antidepressant also used for panic disorders, as well as Cogentin to treat the side effects of Risperdal. Stopping such drugs can lead to a recurrence of the symptoms, and for a longtime user, stopping the drugs puts the person at an "extremely high risk for redeveloping psychosis and mood disturbances," which can manifest in "days to weeks." Methamphetamine can cause short-term and long-term psychotic symptoms, including hallucinations.

On cross-examination, Dr. Sokolov agreed that defendant's records of a July 2, 2014 meeting with his social worker at a psychiatric clinic reflected he was well-groomed, had good hygiene, and had denied any homicidal or suicidal ideation. Schizophrenia encompasses a wide spectrum of severity, and Dr. Sokolov had not evaluated defendant to assess whether he had schizophrenia or whether he was malingering, that is, falsifying or exaggerating his symptoms.

Allen Lee, defendant's former social worker at the mental health clinic, testified he met with defendant for 50 minutes on July 2, 2014, and defendant did not report any suicidal or homicidal thoughts, and said he had been taking his medications. In a telephone conversation on May 28, 2014, defendant told Lee he wanted to divorce his wife and he was taking his medication. About a week before, he had told Lee his wife was cheating on him.

Monte Chavez, defendant's friend, testified there was nothing unusual about defendant's demeanor the night before the killing. From both defendant and his wife for the prior few weeks, Chavez understood that they were going to break up, but defendant did not seem worried about it.

The parties stipulated that Dr. Matthew Pitcher, a jail psychiatrist, would testify that he had been treating defendant for schizoaffective disorder, and had prescribed defendant Trazodone, Risperdal, and Depakote.

There was no rebuttal case by the People.

*Closing Arguments*

The prosecutor began his closing argument by giving two reasons why "this is first degree murder every single day of the week." First, because defendant stabbed the victim twice in the neck and admitted on the stand that he stabbed her the second time because he wanted to finish her off; second, "we know he premeditated and he deliberated because he's been in the same situation before. He's gone over it in his head for 23 years what he's going to do if he's in the same situation again with another woman that's going to leave him."[1] The prosecutor argued that express and implied malice were shown by defendant's actions in holding the knife to her throat and stabbing her twice, and defendant admitted he thought about what he was doing. The fact there were two stab wounds to the neck, as well as a defensive wound, undermined any claim of an accident, or mere criminal negligence. Defendant's motive was that his wife was leaving him, and he had previously shot his former mother-in-law when his prior wife tried to leave him. The killing was not an accident or done in the heat of passion because of the nature of the

_____

[1] This argument was based on the following cross-examination of defendant: "Q And you've been in the situation before; right? In 1991, [defendant], Becky [W., your former wife] was leaving you; right? [¶] A Yes. [¶] Q And you went over to her mother's house to try to get Becky [W.] back, didn't you? [¶] A Yes. [¶] Q And when [Becky's] mother stepped out of the back of the house and tried to intervene you shot her in the face, didn't you? [¶] A That's correct. [¶] Q And in 1992 you admitted shooting Betty [T.] in the face with the intent to kill? [¶] A Correct. [¶] Q And since that night you must have played that over in your head a thousand times? [¶] A Yes. [¶] Q And thought about what you would have done different if put back in the same situation; right? [¶] A Correct. [¶] Q And in 2014, when you're in that van with Tanganyika facing the same situation of her leaving you, you chose the same path, didn't you? [¶] A No, not exactly."

wounds, "coupled with the fact that he has acted with the specific intent to kill back in 1991[,] we know he's doing it [in] this case." There was no provocation; "[h]e showed us that back in 1991. He was trying to get his wife back at that time. And when his mother-in-law tried to step in and keep him from getting his wife back he shot her in the face. [¶] Same thing happened here. The same intent is there. The same motive is there." "Defendant intended to kill before in the exact same situation. And he actually was convicted of shooting with the intent to kill. That's why they're asking for a manslaughter. That's why this is a first degree murder." "[L]et's talk about extent of reflection. Has anybody had more time to reflect on what they're going to do if this situation ever arose again than the guy that was actually in this situation back in 1991[?] [¶] He had more time than anyone to reflect on what's going to happen when she intends to leave him. What the consequences might be if he decides to kill her and whether or not he should go forward with it. [¶] That's why that evidence is so powerful. It's been almost 23 years four months . . . ." "He's got 1991 going through his head. He's got her leaving going through his head. He knows the consequences. He knows what he's about to do. And he does it again when he stabbed her again to finish her off. That's first degree murder."

The prosecutor also argued that when defendant moved the van, changed his appearance, followed news about the case in the library, and planned to flee to Oklahoma, his actions reflected his consciousness of guilt.

The defense argued defendant fled the scene because he *was* guilty of a crime, but only voluntary manslaughter because he acted in the heat of passion. This was based on defendant's mental illness and drug usage, his dependence on the victim, and growing stress of the impending break-up that culminated in her smirking defiance when he asked her directly about divorce. Defendant's mental illness made him "easy prey" for the prosecutor, and his inculpatory testimony was adduced via the prosecutor's skilled questioning. There was no way to know what happened in the van, except that defendant

11

inflicted the victim's wounds. Defendant had known the marriage was in doubt for some time, so it was not something the victim surprised him with the morning of the killing. There was evidence from a neighbor that suggested the couple had been in the van for quite some time, listening to music, suggesting an amicable meeting that negated premeditation. "So if [defendant] was planning on killing his wife why would he wait at least an hour and 45 minutes before stabbing his wife? [¶] If [defendant] was planning on killing his wife that morning, why wouldn't he drive to a much lonelier place?" Defendant did not lure the victim into his van to kill her; he was simply living in the van when he invited her inside. And if he wanted to kill her, he would not have used a box cutter, but one of the deadlier knives found in the van, and would not have left other knives around that she might have used to defend herself. His schizophrenic hallucinations, perhaps exacerbated by the methamphetamine, further negated first degree murder, and defendant did not weigh the pros and cons of his actions. Defendant loved the victim, in part as shown by the telephone messages he had left for her.

In reply, the People argued defendant did not show "one drop of emotion" on the stand nor in his jailhouse calls did he reflect any love for the victim. The fact defendant's plan was a bad plan does not mean he did not form a plan to kill the victim. "What this guy planned was to confront his wife. And he knew what he would do if she did not comply. And how do we know that? Because he's been there before. He's been in almost this exact situation." Defendant had replayed his 1991 actions in his head many times.

*Verdict and Sanity Trial*

After returning its first degree murder verdict, and after a brief sanity trial that is not at issue, the jury found defendant was sane at the time of the killing.

12

## DISCUSSION

### I

*Evidence of Premeditation and Deliberation*

In different ways, defendant contends no substantial evidence supports premeditation, deliberation, or malice. We disagree.

In assessing defendant's claims we will not consider evidence presented in the defense case (due to defendant's claim of ineffective assistance based on trial counsel's failure to move for acquittal under Pen. Code, § 1118.1) or evidence of the 1991 Oklahoma incident (due to our holding, *post*, that this evidence was admitted in error).

Much--but not all--of defendant's briefing reweighs evidence or chooses between competing inferences, matters within the province of the jury. " 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

A. *Deliberation and Premeditation*

" 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Our Supreme Court has established guidelines for our review, as follows:

> "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts

13

about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), original italics.)

The above passage did not change the definition of murder or establish elements that had to be proven in each case; it established "guidelines to aid reviewing courts in analyzing the sufficiency of the evidence to sustain findings of premeditation and deliberation." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*).) "The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*Ibid.*; see 1 Witkin, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 123, p. 919.) Or as we have phrased it before, the factors do not impose "a straightjacket on the manner in which premeditation can be proven adequately at trial." (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420.)

Here, there is evidence of motive: rage at the collapse of the marriage. There is also evidence of the intentional and deliberate manner of killing: two neck stabs, with an implied interval to reflect, as well as the infliction of blunt force trauma in different areas of the victim's body. (See *People v. Stitely* (2005) 35 Cal.4th 514, 544 ["defendant had ample opportunity to consider the deadly consequences of his actions"]; *People v. Steele* (2002) 27 Cal.4th 1230, 1250 [use of two methods of inflicting harm, stabbing and strangling, tended to support premeditation and deliberation] (*Steele*); see also *People v. Combs* (2004) 34 Cal.4th 821, 851 ["use of multiple methods"]; *Perez, supra*, 2 Cal.4th

at p. 1127 ["The manner of killing is also indicative of premeditation and deliberation. The evidence of blood in the kitchen knife drawer supports an inference that defendant went to the kitchen in search of another knife after the steak knife broke. This action bears similarity to reloading a gun or using another gun when the first one has run out of ammunition"].)

The jury *could* have reasonably found that the victim's injuries reflected an emotional, berserk, attack, as suggested by defendant's briefing. But it was permitted to find otherwise. A case discussing manner evidence, repeatedly cited by defendant's briefing, cuts against his position. The case (quoted more fully than reflected in the briefing) provides as follows:

> "Manner of killing is the least strong of the *Anderson* categories as the case comes to us. *The manner of killing here—stabbing two victims more than two times each, including around the face, the neck and lungs—is, at least in a vacuum, associated with someone losing his mind and going berserk, which is not a state of mind we associate with premeditation or deliberation.* We note an irony here: The more genteel the form of dispatch, the more readily premeditation may be inferred. Vicious brutal knifings, particularly when the victim is awake and fighting back, tend to fall on the opposite side of the spectrum from, say, the administration of arsenic in a guest's tea. That said, our Supreme Court *has*, in [*Perez*, *supra*, 2 Cal.4th 1117], upheld a first degree murder conviction in a vicious knife attack no less gruesome than the ones here.
>
> "To be sure, [the defendant] did not have the element of surprise, as shown by the 'defensive' wounds sustained by both victims. Even so, the numerous blows to the neck and vital organs of both victims, including a blow that penetrated [one victim's] eye, supports the reasonable inference, similar to *Lewis*, that the blows were intended to kill rather than merely wound. (See [*People v. Lewis* (2009) 46 Cal.4th 1255, 1293] [the 'additional act of slashing her throat "is indicative of a reasoned decision to kill" '].)" (*People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1118, first italics added, second in original.)

Defense counsel repeatedly relies on the italicized sentence of *Nazeri*, which muses academically about whether such manner of killing necessarily reflects deliberation and premeditation. But the *holding* of the case is that the manner of killing

15

described *did* manifest those mental states. Read in context, this passage of *Nazeri* supports the conclusion that the manner of killing here shows premeditation and deliberation.

Although there was not a great deal of evidence of planning by any measure, the jury could rationally find defendant talked his wife into the van to induce her to remain in the marriage or--failing that--to kill her. And, as the Attorney General points out, strong evidence of planning is not always required. (See, e.g., *People v. Hernandez* (1988) 47 Cal.3d 315, 349-351 [affirming where motive and manner showed deliberate killing, although evidence of planning was slim and the time for reflection was slight].)[2]

Further, the jury did not have to conclude defendant's consciousness of guilt pertained only to a lesser offense, but instead could find defendant knew he had killed the victim and had desired that outcome. Defendant abandoned his van, prepared to flee to Oklahoma, and gave a false name when arrested weeks later. That postkilling conduct, as well as the implication from the People's case-in-chief that defendant did nothing to help the victim after he stabbed her, speaks volumes as to his mental state. (See *People v. Lasko* (2000) 23 Cal.4th 101, 112 ["defendant's actions *after* striking the fatal blow were not those of an unintentional killer: he did not call an ambulance, he tried to obscure evidence of the killing . . . ."].)

Defendant relies heavily on *People v. Boatman* (2013) 221 Cal.App.4th 1253, but that case is factually dissimilar. *Boatman* explained: "Defendant's behavior following the shooting is of someone horrified and distraught about what he had done, not someone who had just fulfilled a preconceived plan. Immediately after the fatal shot, defendant tried to resuscitate [the victim] and directed his brother to 'call the cops.' Defendant could be heard crying in the background during the 911 call." (*Id*. at p. 1267.) Here,

_____
[2] We recognize, as defendant emphasizes, that *Hernandez* involved an egregious double murder. We cite it merely to illustrate that clear planning evidence is not always needed, a point also made in *Anderson*, *supra*, 70 Cal.2d at pages 26-27.

there was no evidence that defendant did anything to help the victim. *Boatman* also pointed to the paucity of evidence of motive (*id.* at pp. 1267-1268), whereas here, the impending break-up of the marriage provided a motive. *Boatman* found the manner of the killing--a shot to the face--showed malice, but not premeditation. (*Id.* at p. 1268.) Here, the victim was stabbed twice in the neck, had a defensive cut on her thumb, and had recent blunt force injuries. *Boatman* is not at all similar to this case.

Accordingly, substantial evidence shows premeditation and deliberation.

B. *Malice*

In another portion of his brief, faulting trial counsel for not moving to acquit at the close of the People's case, defendant contends the People did not introduce substantial evidence of malice, either express or implied. We disagree.

From the evidence showing the victim was stabbed twice in the neck, coupled with a defensive stab and blunt force injuries, the jury could infer that defendant acted with implied malice, that is, a conscious disregard for a high probability of death. (See *People v. Knoller* (2007) 41 Cal.4th 139, 152; *People v. Canizalez* (2011) 197 Cal.App.4th 832, 842.) Further, the jury could find that by inflicting such injuries defendant acted with express malice, that is, he knew to a substantial certainty that death would likely ensue from his actions. (See *People v. Smith* (2005) 37 Cal.4th 733, 739.) Although not a compelled inference, the jury could rationally find that two stabs to the neck is a method of killing that "was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' " to kill. (*Anderson*, *supra*, 70 Cal.2d at p. 27.)

Accordingly, the case-in-chief provided substantial evidence of malice.[3]

_____

[3] Our conclusion that sufficient evidence supports first degree murder based solely on evidence in the case-in-chief apart from the Oklahoma incident resolves defendant's claim that trial counsel provided ineffective assistance of counsel by failing to move to acquit at the close of the People's case. Such a motion would have failed. (See *People v.*

17

## II

### *Admission of Evidence of the Oklahoma Incident*

Defendant contends evidence of the Oklahoma incident should not have been admitted, and in an overlapping claim contends the jury should not have been instructed that it could use that evidence to determine whether the evidence showed premeditation and deliberation, intent to kill, motive, or absence of mistake.

Defendant argues that "[t]he fact that [he] reacted violently to the breakup of his marriage in 1991 and shot his mother-in-law while struggling with his estranged wife does not support a reasonable inference that he killed his current wife with premeditation and deliberation 23 years later." We are compelled to agree.

First, the dissimilarity between the two incidents is so great that the evidence of the uncharged act had no (or very little) "tendency in reason" (Evid. Code, § 210)[4] to speak to defendant's mental state during the charged act. Second, even assuming the 23-year-old shooting had some minimal relevance, its probative value was clearly outweighed by the danger of undue and unfair prejudice resulting from its introduction. This danger was compounded (and capitalized on) by the prosecutor's use of this inflammatory evidence for the impermissible purpose of arguing defendant's violent tendencies and propensity to react violently during marital disputes (e.g., "he knew what he would do if she did not comply. And how do we know that? Because he's been there before"). Thus admission of the evidence of the 1991 shooting was error.

Because the case for first degree murder--while adequate (see part I, *ante*)--was not particularly strong and was countered by substantial contrary evidence, and because the prosecutor relied so heavily on the prior evidence in cross-examination and argument, we find the error was prejudicial, that is, it is reasonably probable defendant would have

---

*Constancio* (1974) 42 Cal.App.3d 533, 546; see also *People v. Eckstrom* (1974) 43 Cal.App.3d 996, 1000-1003.)

[4] Further undesignated section references are to the Evidence Code.

achieved a more favorable result had the evidence been excluded.  (See Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)  This compels reversal.

A.  *Background*

Before trial, defense counsel conceded defendant had been released from an Oklahoma prison in 2005 and had been convicted of felon in possession of a firearm in California in 2007.  The trial court found the 1992 Oklahoma conviction (based on 1991 conduct) was not stale for impeachment purposes because defendant had not led a blameless life.[5]

The parties then discussed in some detail the People's motion to admit evidence of the Oklahoma incident to show premeditation and deliberation, intent, motive, and lack of mistake or accident.  Although section 1101, subdivision (a) generally bars "evidence of a person's character or a trait of his or her character . . . when offered to prove his or her conduct on a specified occasion," the People relied on subdivision (b) of that statute, which provides in part:

> "Nothing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) *other than his or her disposition to commit such an act*."  (§ 1101, subd. (b), italics added.)

In his written motion the prosecutor repeatedly likened the two cases by arguing defendant was trying to preserve the "status quo" of his married life in each one, which tended to show motive, intent to kill, and deliberation and premeditation.  The prosecutor

_____

[5]  The 1992 conviction (by plea) was for violating a statute that then provided in part: "Every person who intentionally and wrongfully shoots another with or discharges any kind of firearm, with intent to kill any person, is punishable by imprisonment in the penitentiary not exceeding life."  (Former Okla. Stats., tit. 21, ch. 21, § 652; Okla. Laws 1987, ch. 58, § 1, eff. Apr. 30, 1987.)  The felon-in-possession conviction was also ruled admissible for impeachment over the objection that it was a mere "status" crime that had little impact on credibility, but it does not appear that it was used at trial.

19

represented that "*[t]his might be the most important evidence in this case*"; and that "[i]t is also relevant for the doctrine of chances or to negate mistake or accident. . . . The doctrine of chances is based on a combination of similar events, and it teaches that the more often one does something, the more likely something was intended and even premeditated rather than accidental or spontaneous. [¶] Specifically, the more often one kills, especially under similar circumstances—and that is what is key in this case— circumstances are very similar—the reasonable inference [is] that the killing was intended and premeditated. That is what this entire case is going to be about . . . ."

The prosecutor acknowledged that the 1991 attack was a shooting and the current offense involved a knife, but argued they were committed "under very similar circumstances where this defendant is about to lose his wife and his family, his status quo, this is how he reacts, and this is how he punishes the people that are going to take that away from him." He also acknowledged the victim in 1991 did not die, but argued that minimized the inflammatory nature of the evidence in comparison to this case where the "victim died under very disgraceful circumstances."

Defense counsel argued this was pure propensity-for-violence evidence. The passage of time and dissimilarity of the two incidents belied any claim that the former permissibly shed light on the latter.

After considering the moving papers and oral arguments, the trial court ruled the evidence was admissible for the purposes sought to be proven under section 1101, subdivision (b).[6] In assessing prejudice under section 352, the trial court ruled the

_____

**6** The trial court later ruled the evidence was also admissible under section 1109. This was incorrect and is not defended by the Attorney General. That statute permits evidence of prior " 'domestic violence' " and defines that term by referencing two other statutes. (§ 1109, subd. (d)(3).) One cross-referenced statute, Penal Code section 13700, subdivision (b), defines the term so that it would include defendant's former wife, but *not* his former mother-in-law. The other, Family Code section 6211, subdivision (f), would include the former mother-in-law (a person "related by . . . affinity within the second degree"), but does not apply to incidents "more than five years before the charged

evidence was not unduly prejudicial because although "one could argue shooting somebody in the face is pretty darn prejudicial," "in that case that person did not die." Whether or not the jury should learn defendant had already been punished was a matter left to defense counsel's tactical decision; defense counsel objected to mention of punishment, believing the jury would infer defendant had been punished. The trial court did not discuss other factors.

The testimony about this incident consisted of former victim Betty T.'s daughter's testimony, accompanied by an initial limiting instruction. Defendant also testified that he had served his time for that crime, which was referenced in his telephone call to Nance as a 15-year sentence. As we noted (see fn. 1, *ante*), defendant also admitted in his testimony that he had "played that over" in his head a thousand times and thought about what he would do differently if placed in the same situation, although he did not agree with the prosecutor that he had "chos[en] the same path" in committing the instant offense.

At the end of the trial, the trial court gave the pattern limiting instruction, CALCRIM No. 375, to which no objection was interposed.[7]

---

offense." (§ 1109, subd. (d)(3).) Therefore, as defendant correctly notes, section 1109 does not apply herein. Despite this (erroneous) ruling, the trial court did not instruct the jury that the evidence was admissible for consideration of propensity under section 1109.

[7] That instruction reads as follows: "The People presented evidence that the defendant committed the offense of shooting with intent to kill that was not charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the offense. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant acted with the intent to kill in this case or premeditated and deliberated; or [¶] The defendant had a motive to commit the offense alleged in this case; or [¶] The defendant's action was not an accident or a mistake. [¶]

21

As detailed above, the prosecutor heavily relied on this evidence during argument, and therein implied that the prior shooting showed defendant's propensity to act in the violent and desperate manner alleged toward his current wife.

B. *Analysis*

"We review the trial court's decision whether to admit evidence, including evidence of the commission of other crimes, for abuse of discretion. [Citation.]" (*People v. Harris* (2013) 57 Cal.4th 804, 841.) But discretion is delimited by the applicable legal standards, a departure from which constitutes an "abuse" of discretion. (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297-1298.) "The discretion conferred upon the court 'is a discretion, governed by legal rules, to do justice according to law or to the analogies of the law, as near as may be.' [Citation.] That is to say, the range of judicial discretion is determined by analogy to the rules contained in the general law and in the specific body or system of law in which the discretionary authority is granted." (*County of Yolo v. Garcia* (1993) 20 Cal.App.4th 1771, 1778.)

"Except as otherwise provided by statute, no evidence is admissible except relevant evidence. (Evid. Code, § 350.) Relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact . . . .' (*Id.*, § 210.) The trial court is vested with wide discretion in determining the relevance of evidence. [Citation.] The court, however, has no discretion to admit irrelevant evidence. [Citation.] 'Speculative inferences that are derived from evidence cannot be deemed to be relevant

---

In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder or that the shooting with intent to kill has been proved. The People must still prove the charge and every allegation beyond a reasonable doubt." (CALCRIM No. 375.)

to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose.' [Citation.]" (*People v. Babbitt* (1988) 45 Cal.3d 660, 681-682.)

We have summarized the general rules about prior crimes evidence as follows:

"As a general rule, evidence of uncharged crimes is inadmissible to prove the defendant had the propensity or disposition to commit the charged crime. [Citations.] 'The reason for this rule is not that such evidence is never relevant; to the contrary, the evidence is excluded because it has too much probative value.' [Citations.] ' "The natural and inevitable tendency" ' is to give excessive weight to the prior conduct and either allow it to bear too strongly on the present charge, or to take the proof of it as justifying a conviction irrespective of guilt of the present charge. [Citations.]

"Evidence of other crimes is admissible, however, when relevant for a noncharacter purpose—that is, when it is relevant to prove some fact other than the defendant's criminal disposition, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake [of fact] or accident.' [Citations.]

"Although a prior criminal act may be relevant for a noncharacter purpose to prove some fact other than the defendant's criminal disposition, the probative value of that evidence may nevertheless be counterbalanced by a section 352 concern. Evidence may be excluded under section 352 if its probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'

"Thus, the admissibility of uncharged crimes depends upon three factors: (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the material fact (i.e., probative value); and (3) the existence of any rule or policy requiring the exclusion of relevant evidence (i.e., prejudicial effect or other § 352 concern). [Citations.]

"Courts subject other crimes evidence to ' "extremely careful analysis" ' [citation] and review the admission of such evidence for abuse of discretion [citation]. 'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion. [Citation.]' [Citations.] Thus, '[t]o determine if a court abused its

23

discretion, we must . . . consider "the legal principles and policies that should have guided the court's actions." [Citation.]' [Citation.]" (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238-239 (*Hendrix*).)

"The reasons for exclusion are: '*First*, character evidence is of slight probative value and may be very prejudicial. *Second*, character evidence tends to distract the trier of fact from the main question of what actually happened on the particular occasion and permits the trier of fact to reward the good man and to punish the bad man because of their respective characters. *Third*, introduction of character evidence may result in confusion of issues and require extended collateral inquiry.' [Citations.]" (1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 44, p. 422, original italics.) " '*It is objectionable, not because it has no appreciable probative value, but because it has too much*. The natural and inevitable tendency of the tribunal--whether judge or jury--is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.' " (*Id.* at § 76, p. 460, italics added; see *People v. Fitch* (1997) 55 Cal.App.4th 172, 179.) "The primary reasoning that underlies this basic rule of exclusion is not the unreasonable nature of the forbidden chain of reasoning. [Citation.] Rather, it is the insubstantial nature of the inference as compared to the 'grave danger of prejudice' to an accused when evidence of an uncharged offense is given to a jury. [Citations.]" (*People v. Thompson* (1980) 27 Cal.3d 303, 317 (*Thompson*).)[8] "Since 'substantial prejudicial effect [is] inherent in [such] evidence,' uncharged offenses are admissible only if they have *substantial* probative value. If there is any doubt, the evidence should be excluded. [Citation.]" (*Id.* at p. 318, original italics, fn. omitted.)

---

[8] *Thompson* was later disapproved to the extent it suggested that something more than a not guilty plea was necessary to place in issue all elements of an offense. (See *People v. Scott* (2011) 52 Cal.4th 452, 470-471.)

We find very little, if any, similarity between the two incidents, and certainly none that would allow a fact finder to infer anything about defendant's conduct in the present case based on his actions in the prior case other than improper reliance on the evidence as character or propensity evidence.

In 1991, defendant admittedly shot his former mother-in-law with the intent to kill her when she intervened as he grabbed at his former wife, who had left him. In 2014, while defendant and his wife were in his van where they often stayed together, using drugs and listening to music while they discussed the future of their troubled marriage, he evidently beat her, causing blunt force injuries, cut her thumb, stabbed her twice in the neck, and then left, allowing her to bleed to death. He admitted the killing; the dispute was over his mental state at the time.

The People's in limine motion argued the evidence would show that "defendant had '1991' in mind when [the victim] attempted to take away his status quo in 2014." In his briefing, defendant persuasively refutes the prosecutor's "status quo" argument. "The People theorized that [defendant] attempted to kill his mother-in-law in 1991 because she interfered with his effort to preserve the 'status quo' of his marriage to Becky. That does not support a theory that he intended to kill a different wife 23 years later. *Killing her would destroy the status quo of his marriage, not preserve it*." (Italics added.) As for motive, he did not kill the present victim "with the same motive that compelled him to shoot his mother-in-law. After all, his motive for shooting her in 1991 stemmed from his desire to *stay married* to Becky and to prevent her (a third party) from interfering with his efforts to take her back. He was not motivated to kill Tanganyika because he wanted to preserve his marriage and stay married to her, nor was his violence directed at a third party. Killing her ended his marriage, which is the opposite of what he sought to achieve in 1991." (Original italics.)

As we have set forth *ante*, at argument in the trial court the prosecutor posited the shooting was properly admitted under the "doctrine of chances." The Attorney General

does not even attempt to defend the admission on that ground, nor can he. Instead, he argues that the evidence was relevant to prove defendant's mental state, i.e., that defendant acted with premeditation and deliberation, and with the intent and motive to kill as well as in the absence of mistake or accident.

The discretion to admit prior acts evidence to show intent is broad, but not unbounded. "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] *In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance*." [Citations.]' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*), italics added.)

Put another way: "In ascertaining whether evidence of other crimes has a tendency to prove the material fact, the court must first determine whether or not the uncharged offense serves ' "logically, naturally, and by reasonable inference" ' to establish that fact. [Citations.] The court 'must look behind the label describing the kind of similarity or relation between the [uncharged] offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong.' [Citation.] *If the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.* [Citations.]" (*Thompson*, *supra*, 27 Cal.3d at p. 316, fns. omitted, italics omitted, italics added; see *People v. Cage* (2015) 62 Cal.4th 256, 274 [for motive, the prior incident may be dissimilar "provided there is a direct relationship or nexus between it and the current" offense].) And even to negate accident or mistake (that

is, to show criminal intent), although the "least degree of similarity" is required (*Ewoldt*, *supra*, 7 Cal.4th at p. 402), the incidents must be similar enough to support the inference that the defendant probably bore the same intents each time. (*Ibid*.; see *Hendrix*, *supra*, 214 Cal.App.4th at pp. 242-243; *United States v. Miller* (9th Cir. 1989) 874 F.2d 1255, 1269 ["when prior crimes are used to establish '. . . absence of mistake or accident,' such evidence simply lacks probative value unless it is sufficiently similar to the subsequent offense. [Citation.] This is true because, if the prior act is not similar, it does not tell the jury anything about what the defendant intended to do in his later action"].)

The Attorney General argues that the two incidents were sufficiently similar because both "involved a domestic violence situation," and any differences in the circumstances merely go to the weight of the evidence, not its admissibility to show intent. But there was nothing suggesting premeditation or deliberation about the 1991 incident; there, defendant suddenly shot his former mother-in-law when she intervened on behalf of her daughter. The People's theory in the 2014 incident was that defendant lured the victim into the van in order to kill her, or at least formed the deliberate and premeditated intent to kill her while conversing inside the van. Apart from the fact that a troubled marriage was involved in both cases, they are completely different kinds of incidents. They are not of the kind where the former sheds any probative light on the latter, as in the three cases relied on by the Attorney General. (Cf. *People v. McCurdy* (2014) 59 Cal.4th 1063, 1098 [prior incest against young sister was probative of the defendant's lewd intent toward another female child]; *Steele*, *supra*, 27 Cal.4th at p. 1244 [both prior and charged victims--who resembled each other "somewhat"--were strangled and stabbed multiple times in the chest or abdomen, and after each killing the defendant admitted his actions but each time he claimed intoxication was at least partly responsible]; *People v. Carpenter* (1997) 15 Cal.4th 312, 383 [serial sex killer; "the more often defendant killed or raped, the more likely he (1) intended (and premeditated) the

result actually achieved, (2) intended to fulfill his statement of intent to rape [one victim], and (3) intended to kill [another victim] although [that victim] survived"].)

This case is nothing like the three cases relied on by the Attorney General. Application of his broad "domestic violence" theory would allow any prior assault against any family member to be admitted in a subsequent prosecution for an assault against another family member. Section 1101, subdivision (b) does not stretch so far.

Further, contrary to a claim made in the prosecutor's moving papers, there was no claim of accident or mistake in the 1991 case. Unlike the instant case, there defendant *admitted* by his plea that he shot his former mother-in-law *with the intent* to kill her. We fail to see how the fact that defendant admitted harboring an intent to kill during a shooting in 1991 has any tendency in reason to prove or disprove accident or mistake during a struggle resulting in multiple (and ultimately fatal) knife wounds in the present case.

As for motive, the Attorney General properly cites authority for the proposition that prior acts are admissible where there is "a direct logical nexus" between them. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 15 ["the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, *so long as the offenses have a direct logical nexus*," italics added].) We see no direct logical nexus in this case, for the reasons explained above. True, it can be inferred that in both cases defendant was *angry* at his respective wives, but he never stood accused of harming his first wife or even intending to do so. Instead, he lashed out at his mother-in-law. Although that evidence is certainly probative of defendant's tendency toward violence when confronted, that is not a proper reason for admission under the relevant statute here. Admission to prove a penchant for violence or conduct in conformity is expressly disallowed. (See § 1101, subd. (a).) Further, the Attorney General cites no case showing that commission of an assault while angry evidences a *motive* to commit an assault in the future. Again, the evidence must be

28

relevant for a *proper purpose*, not merely relevant to a tendency to behave badly. As defendant's briefing points out, his motive for the 1991 shooting was generated by his desire to prevent a third party from interfering with his marriage; here, killing the victim ended his marriage rather than preserving it.

Even if we stretched section 1101, subdivision (b) to find a preliminary showing of relevance, for reasons we discuss in more detail *post* the evidence was far more prejudicial than probative. Further, the prosecutor's closing arguments consistently tied the current incident to defendant's purported state of mind in 1991. This raises the real likelihood that the jury--albeit in derogation of its instructions--would use the prior incident to improperly shore up the thin case for premeditation and deliberation.

In *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*), a case involving section 1108 but also addressing section 1101, we outlined the following factors to be considered in admitting other act evidence: (1) the comparatively inflammatory nature of the uncharged act; (2) the probability of jury confusion; (3) remoteness; (4) consumption of time; and--perhaps most importantly--(5) the probative value of the prior act. (*Harris, supra*, at pp. 737-741.)

As stated, we perceive little permissible probative value in this evidence, because the dissimilarities between the two cases means there is little to no strength to the chain of inferences leading one to conclude defendant bore any particular mental state in this case based on what happened in 1991. It appears both crimes were about equally heinous, because although only the current victim died, the other case reflected an admitted intent to kill by means of shooting. Although the direct testimony about the Oklahoma incident was brief, it occupied a grossly disproportionate part of the People's cross-examination and closing arguments. As the prosecutor had represented to the trial court at the hearing on the motions in limine, it was the "most important evidence" of his case. This means the jury would very likely be confused, meaning distracted from the question at hand and instead focused on discerning to what extent defendant really might

29

be inclined to violently attack and kill, with the preplanned intent to do so, any wife who would leave him or a relative of hers, and whether this inclination would persist despite the passage of the intervening 23 years, and the very different factual scenarios presented by the two incidents.

In this connection, defendant correctly points out that the strength of an inference from prior act evidence dissipates over time. (See, e.g., *People v. Dancer* (1996) 45 Cal.App.4th 1677, 1691 ["the remoteness of the prior incident from the current one, 11 years, tends to degrade its probative value"], disapproved on another point, *People v. Hammon* (1997) 15 Cal.4th 1117, 1123; see also *People v. Johnson* (2010) 185 Cal.App.4th 520, 535-536 [what may be remote in a case involving dissimilar acts may not be too remote in a case involving similar acts].) In our view, 23 years is a *very* long time (a length of time we deemed remote in *Harris*, although there were other factors in play in that case), and as stated, the fact defendant was in prison for much of that time does not change this view.[9] Given the lack of similarity between the charged and uncharged acts, it was too remote.

_____

[9] Remoteness for purposes of sections 352 and 1101, subdivision (b) is measured differently than remoteness for purposes of impeachment. For the latter, the question often turns on whether the person has led a blameless life, demonstrating that the person no longer has the propensity to lie generally imputed to convicted felons. (See *People v. Burns* (1987) 189 Cal.App.3d 734, 737-739.) For the former, the question is whether the prior conduct is so old that it is not reasonable to conclude it speaks to a person's current mental state. (See *Harris*, *supra*, 60 Cal.App.4th at p. 739 [23 years deemed remote where the defendant had evidently led a blameless intervening life, noting that "the issue is not impeachment, it is the question of predisposition to commit the charged sexual offenses"]; *People v. Whisenhut* (2008) 44 Cal.4th 174, 205 [in assessing remoteness of prior acts, court must consider whether "the passage of time significantly lessened the probative value of the evidence"].) The Attorney General relies on the test applicable in impeachment cases. Defendant (wisely, given his 2007 firearm felony offense) does not argue the ruling admitting the Oklahoma conviction *for impeachment* was an abuse of discretion. But that firearm offense does not tighten or create any logical connection between the 1991 offense and the 2014 offense, it merely shows defendant did not lead a blameless life upon release from prison.

The Attorney General correctly contends the jury learned defendant was punished for the prior crime, and that the jury was given a limiting instruction which it is presumed to have obeyed (see, e.g., *People v. Zack* (1986) 184 Cal.App.3d 409, 415-416), but then argues that "[t]he prosecutor did not encourage the jury to consider the evidence for propensity purposes, either." We disagree. Although the prosecutor did not use the *word* "propensity," he discussed the 1991 evidence at great length and insinuated that in 2014 defendant was acting in conformity therewith. Indeed, as the prosecutor had predicted pretrial, his case for first degree murder hinged on the 1991 shooting.

The prosecutor urged the jury to infer defendant had been planning how he would react to a wife leaving him for 23 years. He argued the present offense posed the "exact same situation" to defendant as that posed in 1991. "What this guy planned was to confront his wife. And he knew what he would do if she did not comply. And how do we know that? Because he's been there before. He's been in almost this exact situation." "He's got 1991 going through his head. He's got her leaving going through his head. He knows the consequences. He knows what he's about to do. And he does it again when he stabbed her again to finish her off." This was a conformity argument disguised as intent, that improperly bolstered the otherwise thin (albeit, sufficient, see part I, *ante*) case for first degree murder. Taken as a whole, this equated to a propensity argument, as the evidence did not significantly speak to any relevant purpose under section 1101, subdivision (b) to justify its use.

We hold the trial court should not have permitted the introduction of this evidence.

C. *Prejudice*

We consider whether the error is prejudicial under the *Watson* standard.[10] Our conclusion is presaged by the preceding discussion, which we will not repeat here.

_____
[10] Defendant contends any error in admitting this evidence violated his federal due process rights, thereby triggering the *Chapman* standard of prejudice. (See *Chapman v.*

There is no doubt defendant caused the victim's death. But his mental state at the relevant time was not clear-cut at all. The jury could easily have inferred that he killed her in the heat of passion, rather than in a calculating way, particularly given his heavy drug usage that week, the evidence he was with her in the van, apparently peaceably for some time, and the lack of an apparent plan--at least a thought out plan--to kill her, among other facts. By so heavily resting the case for murder--and first degree murder to boot--on defendant's 1991 actions, the prosecutor greatly increased the likelihood the jury would also improperly rest its determination thereon. (See *Hendrix*, *supra*, 214 Cal.App.4th at pp. 249-250 [a prosecutor's emphasis or minimization of uncharged act evidence at argument is relevant when considering whether introduction of the evidence was prejudicial].)

We conclude the error was prejudicial, i.e., that it is reasonably probable defendant would have obtained a more favorable result in the absence of the error. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

---

*California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].) We need not consider this point because we find the error prejudicial under the *Watson* standard.

## DISPOSITION

The judgment is reversed and the cause remanded for a new trial.

_____/s/_____

Duarte, J.

We concur:

_____/s/_____

Blease, Acting P. J.

_____/s/_____

Hull, J.