Filed 11/5/24  P. v. Sampognaro CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH SAMUEL SAMPOGNARO, JR.,<br><br>Defendant and Appellant. | H050223<br>(Monterey County<br>Super. Ct. No. 20CR007687) |

Defendant Joseph Samuel Sampognaro, Jr. was convicted by jury of first degree murder (Pen. Code, §187, subd. (a); count 1) for the killing of his father, Joseph Samuel Sampognaro, Sr.  He was also convicted of evading a peace officer with wanton disregard for safety (Veh. Code, §2800.2, subd. (a); count 2), evading a peace officer by traveling against the flow of traffic (Veh. Code, §2800.4; count 3), and illegal possession of a firearm (Pen. Code, §29800, subd. (a)(1), count 4).  The jury found true two firearm allegations attached to count 1 (Pen. Code, § §12022.5, subd. (a), 12022.53, subd. (d)).  The trial court sentenced defendant to 25 years to life for first degree murder consecutive to a 10-year firearm use enhancement and two-year sentences on the remaining counts.

Defendant was represented by a team of two attorneys at trial.  On appeal, he contends his trial counsel were ineffective for failing to object to prejudicial character evidence and to the prosecutor's misconduct in closing argument.  He further argues he was deprived of his right to conflict-free counsel because, during his trial, one of his attorneys engaged in an affair with a sheriff's deputy who was serving as a bailiff in the

courtroom.  Defendant also raises several objections to his sentence.  We will reverse the convictions on counts 1 and 4 due to ineffective assistance of counsel and remand for possible retrial on those counts, and for resentencing on counts 2 and 3.

## I.  TRIAL COURT PROCEEDINGS

### A. TRIAL EVIDENCE

#### 1.  Witness Testimony

Marco[1] owned a ranch in rural Monterey County and lived in a house on the property in 2020.  A number of people were staying on the property in a barn previously used for horses before being converted into storage units and living quarters.  Defendant's father Joseph Samuel Sampognaro, Sr. (whom we will refer to as Senior) lived in one of the units with his girlfriend Maria B.  Marco, who was 90 years old at the time of trial, had known Senior since Senior was a child.  He believed Senior sold drugs, and he noticed a lot of people "coming to the barn" while Senior was living there.

David also lived in the barn.  He had previously worked as a chemical engineer and as a caddy at Pebble Beach, but as of 2020 was unemployed and spent almost all of his time with Senior.  They had met in a bar about five years earlier and had been friends since then.

Defendant and his then-girlfriend moved into the barn in early 2020.  Maria B. also moved in with Senior around the same time.  Around June of that year, sheriff's deputies "showed up and served some warrants" at the ranch.  Defendant and Maria B. were arrested.  While Maria B. was in jail, David advocated for her release.  She was released within a few months and moved back into the barn.  At some point, Maria B. broke up with Senior and started dating David.  David acknowledged secretly dating Maria B. for "a short time" during the "transition" period.  Around September, following

---

[1] Consistent with California Rules of Court, rule 8.90, we will refer to certain witnesses by their first names, meaning no disrespect.  For clarity, we will use last initials where the witnesses share first names.

an argument with Senior, Maria B. moved out of Senior's apartment and moved in with David.

Defendant had also been released from jail by September and moved back into the barn. His girlfriend had moved out while defendant was incarcerated and "Tank" had moved into their old room. Both defendant and Tank used the room after defendant was released from jail. According to Sage, a friend of defendant who lived at the barn before defendant was arrested, defendant seemed paranoid after being released. Defendant blamed Senior for his problems and believed Senior was trying to kill him. He "tried to be close with" Senior, but Senior was "pushing him away" and making him want to use drugs. Defendant stopped using drugs when he was released from jail. Sage used heroin every day and had a spotty memory as a result.

On the morning of September 12, David and Senior were planning to run an errand together. David was sitting in a chair outside Tank's room when he saw Senior and defendant together in the kitchen. He could not hear what they were saying to each other. Senior walked toward David and told him to get ready to leave. When Senior was less than 10 feet away from him, David heard a loud bang and saw Senior fall to the ground. David believed he saw defendant holding a gun but was "not certain." Later, David formed the opinion that defendant had shot Senior with a revolver David had seen at the ranch before.

David was scared and ran out of the barn. He went back inside to get Maria B. and then ran to Marco's house. Marco and David called 911. On the call, which was played for the jury, they told the dispatcher that defendant had shot and killed Senior and driven away in a black Corvette convertible. David testified that he heard the car drive away but did not see it.

David described driving back to the barn in a golf cart with Marco and Maria B. at the time of the 911 call and hearing two more gunshots about five minutes after the first shot. Marco recalled driving to the barn in a golf cart with a "ranch hand" named Pancho

3

before the 911 call was made, and he testified that David did not ride with them. Pancho testified that he stayed at Marco's house and did not go to the barn with Marco.

Maria V. and her mother Maria G. lived together in a trailer near the barn. They were home that morning when they heard two men arguing followed by a gunshot. Maria V. went outside and saw Maria B. rushing from the direction of the barn toward Marco's house, about five or ten minutes after the shot. Maria B. and Marco then drove by in a golf cart toward the barn. A few minutes later, Maria V. saw David run out of the barn. He looked "desperate" and "anxious" and seemed to be looking for someone, likely Marco.

Laurie, who lived in the barn, was in her room that morning when she heard what sounded like a gunshot. She heard two men arguing after the first shot, then heard two more shots roughly three to five minutes later. Hearing someone running down the hallway toward the parking lot, she looked but could not tell whether it was defendant or David. She heard a car drive away and thought it sounded like Senior's Corvette. Marco and Maria B. then arrived in a golf cart. According to Laurie, Marco and Maria B. had a close relationship. Marco was protective of Maria B. and would do anything for her.

The night before, Laurie had heard Senior and Maria B. arguing. It was "really bad" and Laurie described it as the worst fight she had ever heard. Maria B. told Senior she was done with him and "was going to report him" for something. Laurie also heard Senior being physically aggressive toward Maria B. David recalled Maria B. fighting with another woman that night, although Senior was also "briefly" involved. Someone threw something at Maria B. during the fight. David had seen Senior hit Maria B. on one other occasion.

When Marco arrived at the barn on the morning of the shooting, he calmly told Laurie that Senior had been shot. Laurie and Marco walked down the hallway and saw Senior's body covered in blankets. There was "blood everywhere." Laurie saw Tank

4

standing nearby; he seemed "upset" and "hysterical." Marco told Laurie to leave and take Tank with her, which she did.

The first sheriff's deputy arrived at the scene about 15 minutes after the 911 call was made. Marco came out of the barn wearing a bathrobe. He was "extremely animated" and "started yelling and moving his arms around quite a bit, saying things like 'how could you guys do this, how do you let Little Joe out of jail? Look what he's did. [*sic*] He's violent.' " The deputy observed Senior's body, which was covered by a heavy rug and appeared to have been dragged about 10 feet. There were bloody shoeprints on the floor and it looked like someone had used towels to clean up some of the blood. A second sheriff's deputy arrived a few minutes later and found David washing his hands in the bathroom. Police searched the barn and found a grenade, methamphetamine, and nunchuks in Tank's room. An autopsy determined that Senior was killed by multiple gunshots to the head from close range.

Two sheriff's deputies were on their way to the ranch when they saw a black Corvette convertible driving in the opposite direction. They made a U-turn and turned on their lights and sirens but instead of stopping, the Corvette accelerated to a speed of over 100 miles per hour. The deputies followed the Corvette for about 10 minutes as it swerved and crossed into oncoming traffic, almost colliding with other cars. A third deputy joined the chase, and they eventually stopped the Corvette by lightly ramming into it. Defendant was the only person in the Corvette when deputies approached. He seemed calm and had a blank stare on his face. His body and shoes were bloody but he did not appear to be injured. Defendant's hands looked dirty, and one deputy thought they might be stained from drug use. Gunshot residue was not found on defendant's hands. DNA from at least four people was found on defendant's shoes, and Senior was very likely one of those people.

Paul, defendant's uncle and Senior's brother, testified for the defense. He had dated Maria B. before she dated Senior and David. Paul had known Marco for about

5

45 years and had felt threatened by Marco's aggressive behavior toward him. At trial, Paul could not recall whether he told police that Sage—his girlfriend's son—might have been involved in the shooting or had information about it.

### 2. Recorded Interviews and In Limine Rulings

Before trial, defendant successfully moved to exclude evidence of his character. The court ruled the prosecution "may not go into the character of the defendant in their case in chief unless the door of self-defense or violent character of the victim is alleged or unless the door is opened by the [d]efense." Defendant also moved to exclude evidence of his prior arrests and convictions. The trial court found defendant's arrest in the summer of 2020 relevant and admissible and ruled the prosecution could question defendant about certain prior convictions in the event he testified. The parties stipulated to a prior conviction for purposes of the firearm possession charge.

David was interviewed on the day of the shooting, and Sage the following month. During trial, the parties agreed that the interviews of David and Sage would be admitted in their entirety, and the recorded interviews were played for the jury. Our summary is drawn from the interview transcripts included in the record on appeal.

### a. David's Interview

David said in his interview that he moved into the barn in early 2020 and defendant moved in around the same time with his pregnant girlfriend. According to David, there was "tension" between defendant and Senior because defendant's girlfriend used heroin while pregnant and Senior "didn't trust his son around her" due to defendant's reputation for violence. David described defendant as "a violent piece of shit"; "fuckin' nuts"; and "fuckin' clinically insane." He said of defendant, "you never know what you're gonna get with that kid. He'd come knockin' on my door at 3:00 in the morning. You know, and just come in there and start, like, start a fight. … I'm in bed and he just, like, starts punching or somethin' like that and I had to get up and crack 'em with a hammer. … I mean it was mis– miserable." David was "constantly on

6

guard" around defendant, who would "snap" and "go to blows" with David on a regular basis. Defendant "didn't like anybody" and would try to sexually assault Maria B. as well as other women in the barn, but David "was the only one that fought back against him"; in David's words, it was "a very nasty situation."

Around June 2020, police "did a sweep" of the barn because defendant "had some nasty warrants, some real bad ones and so they had to come get 'em." After defendant returned to the barn in the weeks before the shooting, he was "acting really weird." David said defendant "was acting different when he got outta jail. He was stressed out. He was trying to talk to his father. His father would not talk to him at all. … It's, like, he had something on his mind when he – when he got outta jail he was a different person."

On the morning of the shooting, defendant woke David up around 9:00 by slapping him in the face. David said defendant was "obviously on speed or somethin'." Defendant asked David for a phone, and David told defendant that Senior had the phone. David woke Senior, who showered while defendant ran around the barn saying "Where's the phone?" When Senior got out of the shower, defendant started arguing with him about which car defendant would be driving that day. The argument lasted about five minutes. David walked outside to smoke a cigarette and saw Senior walking in his direction. Defendant approached Senior from behind, David heard a loud noise, and Senior fell forward onto the ground. Defendant was holding a gun and there was blood in the vicinity of Senior's head. David said, " 'What the fuck? What the fuck are you doing?' " and defendant replied, " 'Help me move him.' "

David ran out of the barn and to Marco's house, screaming at Maria B. to follow him. He heard two more gunshots before he got to Marco's house. David and Marco called 911 and drove back to the barn in a golf cart. Maria B. and Pancho were with them. Tank was outside and told David that defendant had left in the Corvette. David went inside and saw Senior's body covered in blankets and towels. It looked like

7

someone had tried to clean up the blood. Defendant, who had apparently returned to the barn, was running around with a gun in his hand. David ran outside and heard the Corvette drive away.

David believed the gun defendant used to shoot Senior was a large silver "cowboy" revolver. He had seen Sage using the gun for target practice earlier that year but thought Sage had gotten rid of it.

### b. Sage's Interview

At the time of his interview, Sage was in custody on unrelated charges. He said he was a young child when he first met Senior, but the two had not interacted in many years until Sage's mother started dating Senior's brother about a year before the shooting. Sage met defendant around that time and the two became friends. They both lived in the barn, and Sage dated defendant's cousin for a few months. Defendant was paranoid and ill-tempered. He frequently fought with Sage and other people at the ranch, and Sage was the only one who did not fear him. Sage moved out of the barn after law enforcement raided it, arresting defendant and his cousin.

Sage said defendant was released from jail less than a month before the shooting. Defendant seemed different. At first, he acted more mature and said he wanted to stay sober. But soon after being released, he suffered a drug overdose. After the overdose, defendant seemed even more paranoid than before. Sage described defendant's transformation as follows: "I knew Joey. This is not Joey, and it's worse than Joey. You know what I mean? Joey is already bad before. He got out this last time, he was already bad. Like, the shit he wanted to do, did, it was bad. But this Joey was times a thousand. That was the devil, though. That was the fucking devil, like, sort of I did not wanna be around that." Sage could tell defendant "was gonna do something stupid" because "[t]he devil was in his eyes."

According to Sage, Senior had "no loyalty" or "feelings" toward defendant and acted more like "a friend than a dad." Defendant craved Senior's love, but Senior "didn't

8

really care" about defendant. While defendant was in jail, Senior stole money from him and used it to buy a boat. Defendant had planned to use the money to buy a car. After defendant was released, he and Sage suspected Senior of trying to kill them by altering the brakes on a car they were using. Defendant also learned that Senior had sex with defendant's pregnant girlfriend while defendant was in jail. Sage said defendant "hated his dad" and "wanted to beat him up real bad." The night before the shooting, defendant told Sage he was going to kill Senior and asked Sage to help him. Sage could not tell whether defendant was serious. (In his trial testimony, Sage stated he did not remember his conversation with defendant or telling investigators about it.)

Sage did not see defendant with a gun the night before the shooting. He believed defendant had used a long pearl-handled silver revolver to shoot Senior. Defendant and Sage had used the gun for target practice on several occasions before defendant went to jail, until they were caught using it. They tried to get the gun back after defendant was released but believed others at the ranch, including Nelson, were hiding it from them. The day before the shooting, Sage was present when defendant confronted Nelson and said, " 'Give me the gun or I'm gonna fuck you up.' " Nelson admitted he had the gun but did not give it to defendant at that time. Sage later learned that defendant got the gun from Nelson less than ten minutes before the shooting. There were also other guns at the ranch, including ones belonging to Senior and Tank. At trial, Sage testified that he had never seen defendant with a gun and did not remember using one for target practice with defendant. Sage did not remember telling investigators about the gun or the conversation with Nelson. He said people at the ranch were afraid of Nelson because his sons were high-ranking gang members.

## B. ARGUMENTS, VERDICT, AND SENTENCING

The prosecutor argued defendant was guilty of first-degree murder, but noted the jury could opt to find defendant guilty of a lesser included offense instead. Referring to the verdict form for count 1, the prosecutor stated: "Now, if you believe he's guilty of

first-degree murder, you would mark 'guilty,' and that would be it for this charge. … [I]f you believe he's guilty of first-degree murder, which I believe the evidence supports, this is the only section[] you would have to address. [¶] Now, the rest of this language is if you don't believe the defendant is guilty of first-degree murder, then you have the opportunity to determine whether you think he's guilty of second-degree murder. And, again, if you think he's not, then you would move on to whether he's guilty of voluntary manslaughter." The prosecutor went on to state that the jury could find defendant guilty of second-degree murder "if" it found him not guilty of first-degree murder, and could find him guilty of voluntary manslaughter "if" it found him not guilty of either first- or second-degree murder.

Defense counsel argued defendant may not have been the shooter. Counsel urged that the testimony of David and Sage was not credible, as they provided inconsistent accounts and were motivated to lie—David in order to redirect attention away from himself, and Sage in order to obtain favorable treatment in his own pending criminal proceedings. Alternatively, counsel argued that even if the witnesses were believed, defendant was at most guilty of voluntary manslaughter (under a heat of passion theory) or second degree murder (under a voluntary intoxication theory).

The jury found defendant guilty of first-degree murder as well as the other charged counts. It found true both firearm allegations attached to the murder count. The trial court ultimately sentenced defendant to 25 years to life for first-degree murder, imposed a 10-year enhancement for firearm use, and struck the enhancement for firearm discharge causing death. It imposed a consecutive sentence of two years on count 2 and concurrent two-year sentences on counts 3 and 4.

## C. NEW TRIAL MOTION

Between trial and sentencing, Thomas O'Keefe—one of the public defenders who represented defendant at trial—filed an affidavit declaring a conflict of interest. The trial court relieved the public defender's office and appointed alternate counsel for defendant.

10

Defendant's new counsel later moved for a new trial based on numerous grounds, including that "the failure of the defendant's trial attorney to inform both the defendant and the court of the attorney's sexual relationship with the bailiff during the trial undermined the integrity of the court and the criminal justice system" and "violated the defendant's right to effective conflict-free assistance of counsel under the Sixth Amendment of the United States Constitution and article 1, section 15 of the California Constitution[.]"  The prosecution opposed the motion and an evidentiary hearing was held.

At the evidentiary hearing, Rachel Miller—defendant's other trial attorney—testified that she had been working at the public defender's office for about two years when she was assigned to defendant's case.  She was assigned to handle the case alongside a more experienced attorney, as was customary in the public defender's office.  After that attorney received a judicial appointment, O'Keefe replaced her as Miller's more experienced co-counsel.  Miller considered herself the "second chair" attorney.  O'Keefe and Miller prepared for trial together, and O'Keefe was always present in the courtroom during trial.  Miller handled the opening statement, the closing argument, and the questioning of certain witnesses.  Defendant was generally uncommunicative with his attorneys.

Sheriff's deputy Donovan Gonzales served as a bailiff for part of the trial.  Before trial, Miller and Gonzales had become friends and socialized together with their spouses outside of work.  Then, days before the trial began, they had lunch together and discussed the possibility of a sexual relationship.  Miller and Gonzales met at a hotel on the first day of jury selection and had sex for the first time.  They had sex two more times, once during the trial and once shortly after the verdict, then ended the affair.  Both testified that they did not discuss defendant's case, and Miller said the relationship did not affect her performance as defendant's attorney.  Gonzales said he knew some of the sheriff's deputies who testified, but did not discuss the case with them either.

11

Miller denied flirting with Gonzales in the courtroom during trial. At one point during trial, Miller said, O'Keefe told her she "was being too casual" and she "agreed with him." Michelle Wouden, an attorney in the public defender's office, testified that she had seen Miller openly flirting with Gonzales in court sometime before trial. Wouden also said she was aware that defendant's family had complained about Miller's flirtation with Gonzales. Two of defendant's aunts testified that they had seen Miller flirting with Gonzales during trial, and had complained to O'Keefe about her behavior. They recalled seeing Miller remove her suit jacket during a break in the trial, lift her chest up while looking at Gonzales, and tell Gonzales things were about to "get good" or "get interesting." One of defendant's aunts said defendant appeared to react by hitting himself in the head. She was not sure whether defendant's conduct was related to the flirtation between Miller and Gonzales, and defendant's other aunt confirmed that defendant had hit himself in the head at various seemingly random times throughout the trial.

O'Keefe recalled defendant's aunts speaking to him about Miller's attitude and performance on numerous occasions, including during trial. He remembered one break in the trial when he thought Miller was "being a little bit too friendly" with the prosecutor, deputies, and court staff. Afterward, O'Keefe "took her aside and said something to her." He also spoke to defendant's aunts about the incident. O'Keefe did not think Miller was being flirtatious; his interpretation at the time "was that she was a young attorney who was nervous, and she was trying to calm her nerves." Miller had not worked on a homicide trial before. O'Keefe had worked at the public defender's office for about 15 years at the time of the hearing and had handled roughly 50 felony trials during that time, including around 10 murder trials. They collaborated on trial strategy, and O'Keefe questioned "some of the more complicated witnesses" while Miller "handle[d] the rest." Defendant would not speak to either Miller or O'Keefe, which O'Keefe said limited their ability to develop possible defenses.

12

Following the evidentiary hearing, the trial court denied the new trial motion. With respect to the relationship between Miller and Gonzales, the court said in part: "Although evidence has established the relationship occurred, the defendant has failed to show actual prejudice, failed to demonstrate that the brief affair adversely affected the adequacy of his representation or that a reasonable probability exists that, but for one of his two counsel's perceived deficiencies, the result of the proceeding would have been different."

## II.   DISCUSSION

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant asserts he received ineffective assistance based on counsel not objecting to the admission of prejudicial character evidence and to misconduct by the prosecutor during closing argument. He also contends those errors were cumulatively prejudicial. Although we conclude counsel was not ineffective for failing to object during the prosecutor's closing argument, counsel's acquiescence to the admission of prejudicial character evidence constitutes ineffective assistance requiring reversal.

To establish ineffectiveness of trial counsel in violation of a defendant's right to counsel under the Sixth Amendment to the United States Constitution, a defendant must show both that counsel's performance was deficient and that he was prejudiced by the deficiency. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216–217.) Deficient performance is rarely shown if there was a tactical reason for trial counsel's conduct. (See *People v. Cruz* (1980) 26 Cal.3d 233, 255–256 ["except in rare cases, an appellate court should not attempt to second-guess trial counsel as to tactics"]; *People v. Bolin* (1998) 18 Cal.4th 297, 317 [affirming conviction when alleged failure to object "may well have been 'an informed tactical choice within the range of reasonable competence' "].) To prove prejudice, a defendant must affirmatively show a reasonable probability that, but for his trial counsel's errors, the result would have been different. (*Ledesma*, at pp. 217–218.)

13

### 1. Counsel Was Not Deficient During Closing Argument

Defendant takes issue with the prosecutor's discussion of lesser included offenses during closing argument, and argues his counsel was ineffective for failing to object to it. He contends the prosecutor misstated the law by telling the jury it could only consider a lesser included offense "if" it first determined defendant was not guilty of the greater offense. We do not read the prosecutor's comments as necessarily inconsistent with the court's proper instructions on the topic of lesser included offenses, and even if they were potentially confusing to the jury, we cannot say counsel had no tactical reason for not objecting.

A trial court may instruct a jury not to "*return a verdict* on the lesser offense unless it has agreed … that defendant is not guilty of the greater crime charged," but it may not instruct the jury to avoid "*considering* or *discussing* the lesser offenses before returning a verdict on the greater offense." (*People v. Kurtzman* (1988) 46 Cal.3d 322, 329.) With respect to count 1, the court instructed the jury using CALCRIM No. 640: "You have been given verdict forms for guilty and not guilty of first degree murder, second degree murder, and voluntary manslaughter. [¶] You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not guilty of second degree murder only if all of you have found the defendant not guilty of first degree murder and I can accept a verdict of guilty or not guilty of voluntary manslaughter only if all of you have found the defendant not guilty of both first and second degree murder." (Although defendant notes the court gave no equivalent instruction with respect to count 2, where evading a peace officer was charged as a lesser included offense of evading an officer with wanton disregard for safety, the comments complained of relate only to count 1 and the court's apparent omission as to count 2 does not affect our analysis.)

The prosecutor's statements that the jury would only reach the portions of the verdict form relating to the lesser included offenses "if" it found defendant not guilty of

14

the greater offense are not necessarily inconsistent with the court's proper instructions, which explained that the jury could *consider* the offenses in whatever order it wished but could not *return a verdict* on a lesser offense without first reaching a verdict of not guilty on the greater offense. We therefore do not see "a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Duff* (2014) 58 Cal.4th 527, 568.) Defense counsel could have reached the same conclusion and refrained from objecting to comments that were not at odds with the court's instructions. Given the reasonable tactical explanation for the lack of an objection, we must reject defendant's claim that counsel was ineffective for failing to object.

### 2. Counsel Was Deficient for Allowing Admission of Character Evidence

Before trial, defendant successfully moved to exclude evidence of his character. (See Evid. Code, § 1101.) Despite the court's ruling, defense counsel agreed during trial to the admission of two recorded interviews in which witnesses David and Sage spoke extensively about defendant's character.

Defendant asserts, and the Attorney General does not appear to contest, that many statements made by David and Sage on the recordings would have been covered by the in limine ruling on character evidence. They include David's statements that defendant was a violent person who would regularly start physical fights with him in the middle of the night; they had fought 12 times in the previous six months; those fights involved "black eyes" and "hammers"; David was "constantly on guard" in defendant's presence because "he can snap"; defendant was a serial sexual assaulter of women; and defendant had been arrested on "some nasty warrants, some real bad ones" a few months before the shooting. They also include Sage's statements that defendant was a paranoid person with a bad temper and a penchant for violent aggression who became "a thousand" times worse after being released from jail; in Sage's words, "[t]he devil was in his eyes." Defendant contends trial counsel were ineffective for not objecting to admission of the recordings in their entirety, or to testimony that defendant had been incarcerated in the months before

15

the shooting, and that Marco said to a sheriff's deputy following the shooting, "how could you guys do this, how do you let Little Joe out of jail?  Look what he's did.  [*sic*] He's violent."

The Attorney General argues defense counsel affirmatively consented to admission of the recordings, rather than simply neglecting to object, and therefore must have had a tactical reason for doing so.  (Counsel did not expressly agree on the record to admission of other challenged evidence such as Marco's statement, and the Attorney General makes no argument relating to that evidence.)  "Even a deliberate tactical choice by counsel, however, may be an incompetent one." (*People v. Wader* (1993) 5 Cal.4th 610, 658.)  We must examine counsel's choice further to determine whether "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

The decision to allow admission of the recordings in their entirety was discussed outside the jury's presence, but the discussion does not reveal counsel's reasoning behind the decision.  When the prosecutor stated on the record that the parties had agreed to play the recordings in full, the trial court replied:  "All right.  And just for the record, there was quite a bit of discussion as to what portions each side was going to get in and the effect on Evidence Code Section 356.  And I believe that's why the parties reached this agreement."  Both the prosecutor and defense counsel confirmed the court's understanding.  As we read it, the court's summary of the parties' discussion suggests three possibilities:  (1) defense counsel affirmatively sought admission of the challenged statements on the recordings; (2) counsel believed the statements harmful to defendant but admissible; or (3) counsel believed the statements harmful and inadmissible but was willing to allow their admission in exchange for admission of other portions of the recordings.  We find none of the possible explanations satisfactory.

16

Evidence Code section 356 provides:  "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."  The prosecution's use of statements from the two interviews could thus have entitled defendant to introduce other portions of the interviews.  But while certain portions may have supported a possible defense, that is not the case for statements that defendant had a character for violence; was a serial sexual assaulter; and had been charged with other serious crimes in the months before the shooting.  No reasonably competent attorney would have considered such evidence beneficial to defendant.

Nor would a reasonably competent attorney have agreed to play the recordings in full under the belief that Evidence Code section 356 compelled such an agreement, notwithstanding the trial court's explicit in limine ruling on character evidence.  "By its terms [Evidence Code] section 356 allows further inquiry into otherwise inadmissible matter only, (1) *where it relates to the same subject*, and (2) it is necessary to make the already introduced conversation *understood*."  (*People v. Gambos* (1970) 5 Cal.App.3d 187, 192.)  We see no reason why otherwise inadmissible evidence regarding defendant's violent character and past unlawful conduct would have been made admissible by his introduction of unrelated evidence from the recorded interviews.

The Attorney General suggests defense counsel may have believed admission of the full recordings necessary in order to provide context for the trial testimony of David and Sage, or beneficial insofar as evidence about defendant's relationship with his father might elicit sympathy from the jury.  Those rationales may explain why counsel would have wanted to introduce certain statements from the interviews, but not why counsel would have wanted to introduce inflammatory evidence of defendant's character.  For the

17

reasons we have discussed, the character evidence would otherwise have been inadmissible and could not reasonably be viewed as favorable to defendant. A strategic choice to allow admission of the *entire* recordings could therefore only be justified if the full recordings contained other evidence—which would not be admitted without such an agreement—benefiting defendant enough to outweigh the prejudicial impact of the character evidence.

Some statements from the interviews could be interpreted as favorable to defendant. As the Attorney General points out, David and Sage described defendant's tumultuous relationship with his father in ways that could make him appear more sympathetic. But those statements did not directly support any defense theory, and their main probative value related to defendant's motive to commit premeditated murder. For that very reason, the prosecution indicated during the pretrial discussion of character evidence that it intended to introduce evidence of defendant's relationship with his father. Any evidence the Attorney General now argues may have humanized defendant would almost certainly have overlapped with evidence introduced by the prosecution to prove motive. To the extent it did not, it may have been admissible under Evidence Code section 356. Even assuming some additional evidence on the topic remained, no reasonably competent attorney would view its admission as more beneficial than the character evidence was harmful.

Other portions of David's interview were at least consistent with certain defenses. David described being woken up on the morning of the shooting by defendant, who was "obviously on speed or somethin'." He also described an argument between defendant and Senior immediately before the shooting. His statements could be viewed as supporting counsel's argument that defendant was at most guilty of second degree murder (due to voluntary intoxication) or voluntary manslaughter (due to provocation). The Attorney General does not identify those statements as a possible explanation for counsel's tactical decision, and we find such an explanation unlikely given that counsel

18

relied primarily on an identity defense. David's statements also may have been admissible under Evidence Code section 356 as evidence relating to the shooting itself, or under Evidence Code sections 770 and 1235 as prior inconsistent statements. Even if such statements would not have been admitted absent counsel's agreement to admission of the character evidence, we conclude no reasonably competent attorney would have agreed under the circumstances.

Our conclusion that counsel had no rational tactical purpose for allowing admission of the character evidence is confirmed by the fact that the evidence was not confined to the recorded interviews. A sheriff's deputy also testified without defense objection that when he arrived at the crime scene, Marco "started yelling and moving his arms around quite a bit, saying things like 'how could you guys do this, how do you let Little Joe out of jail? Look what he's did. [*sic*] He's violent.' " The Attorney General does not contend the substance of Marco's statement was admissible, or offer any other explanation for counsel's failure to object. Even assuming the statement would generally be admissible as non-hearsay or under a hearsay exception, any portion containing character evidence would be inadmissible. Further, a trial court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A reasonably competent attorney, having already secured exclusion of character evidence, would object to the characterization of defendant as a violent person who should not have been released from custody. (Cf. *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 67.)

### 3. Counsel's Deficiency Was Prejudicial as to Counts 1 and 4

As we have found counsel's performance deficient with respect to the admission of character evidence, we limit our assessment of prejudice to that evidence. We assume for purposes of our analysis that evidence of defendant's arrest in the summer of 2020 would have been properly admitted, even if objected to by defense counsel, in order to

explain the timeline of events leading up to the shooting. But David's statement that defendant was arrested on "some nasty warrants, some real bad ones" went beyond that legitimate objective and invited jurors to speculate as to the nature of the underlying conduct. Given the repeated descriptions of defendant as a violent person who regularly started physical fights and sexually assaulted women, jurors were likely to assume he had been charged with similarly violent crimes. Marco's statement that defendant was a violent person who should not have been released from jail invited further speculation about defendant's past conduct, as well as future violent acts he might commit.

With respect to the charged homicide and the question of its degree, the descriptions of defendant's violent tendencies may have led jurors to conclude that he acted in keeping with those tendencies by shooting and killing his father with premeditation. The logical nature of that inference illustrates the prejudicial impact of the evidence: When presented with evidence of a defendant's uncharged and unrelated criminal conduct, it is all too likely that a jury would " 'give excessive weight to the prior conduct and either allow it to bear too strongly on the present charge, or to take the proof of it as justifying a conviction irrespective of guilt of the present charge.' " (*People v. Williams* (2018) 23 Cal.App.5th 396, 417–418.) The jury here may have relied on the character evidence to find defendant guilty of first-degree murder.

The Attorney General argues any deficient performance by counsel was not prejudicial because there was overwhelming evidence of defendant's guilt. We agree that the evidence of defendant's involvement in the shooting is very strong. But the evidence of premeditation was not overwhelming. Numerous people were present in the barn at the time of the shooting, including some who owned guns or had motives to harm Senior, and defendant was not the only person who left the scene before sheriff's deputies arrived. A gun was not located, and no gunshot residue was found on defendant's hands. David, the only witness who identified defendant as the shooter, also said defendant appeared to be under the influence of a stimulant and had argued with his father

20

immediately before the shooting. And Sage—who spoke to investigators while in custody on other charges, and admittedly had a poor memory due to habitual drug use—said defendant told him in advance that he planned to kill his father, but also said he was not sure defendant was serious. Questions of witness credibility are of course for the jury to resolve. Hearing inflammatory character evidence about defendant may have made jurors less likely to resolve them in his favor.

We consider it possible that at least one juror may have otherwise doubted defendant's identity as the shooter but relied on the character evidence to conclude he committed the crime. It is also possible that at least one juror may have otherwise believed defendant was guilty of only a lesser offense, but viewed the character evidence as proof of premeditation. And it is a concerning possibility that at least one juror might have acquitted defendant of the shooting or found him guilty of only a lesser offense, but felt compelled to convict him of the most serious charge to prevent future violent crimes by a person predisposed to violence. Considering all these possibilities, we see a reasonable probability of a different verdict on count 1 had counsel not allowed damaging character evidence to be admitted, even after obtaining a favorable in limine ruling to exclude it. We also see a reasonable probability of a different verdict on count 4 (illegal possession of a firearm), given that defendant's alleged possession of a firearm was directly tied to his identity as the shooter.

However, we see no reasonable probability of a different verdict on count 2 or count 3. Uncontroverted testimony from multiple sheriff's deputies established that defendant led them on a high-speed chase, driving over 100 miles per hour and swerving into oncoming traffic. The evidence of defendant's evasion with wanton disregard for safety (count 2) and against traffic (count 3) was overwhelming. We will reverse defendant's convictions on counts 1 and 4 only.

## B. CONFLICT OF INTEREST

Defendant argues his attorney's affair during trial with a sheriff's deputy who served as a bailiff for part of the trial gave rise to a conflict of interest that deprived him of his right to counsel. We conclude the relationship created a potential conflict of interest necessitating disclosure, which would not require reversal on its own but contributes to our lack of confidence in the verdict.

"Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his [or her] responsibilities to another client or a third person or by his [or her] own interests." (*People v. Bonin* (1989) 47 Cal.3d 808, 835.) Where an attorney represents only one client (in contrast to multiple codefendants with conflicting interests), potential conflicts are analyzed under the *Strickland* framework for ineffective assistance of counsel. (*People v. Doolin* (2009) 45 Cal.4th 390, 417, citing *Strickland v. Washington* (1984) 466 U.S. 668, 694.) "In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest '*that affected counsel's performance*—as opposed to a mere theoretical division of loyalties.' " (*Doolin*, at p. 417, quoting *Mickens v. Taylor* (2002) 535 U.S. 162, 171.) Determining "whether counsel's performance was 'adversely affected' under the federal standard 'requires an inquiry into whether counsel "pulled his [or her] punches," i.e., whether counsel failed to represent defendant as vigorously as he [or she] might have, had there been no conflict.' " (*Doolin*, at p. 418, quoting *People v. Cox* (2003) 30 Cal.4th 916, 948, 949.)

The State Bar of California has stated that a marital relationship between a defense attorney and a bailiff must be disclosed to both the attorney's client and the court. (State Bar, Formal Opinion No. 1987-93.) The ethics opinion explains that the bailiff is a "neutral participant[] in the adversary proceeding" whose performance of a "critical function" in that proceeding counsel may have occasion to challenge and who "may well

22

be a law enforcement officer, such as a deputy sheriff, whose affiliation with the People and the prosecution may raise questions in the client's mind as to the defense attorney's independence." (*Ibid.*) Such concerns are not limited to marital relationships and "should also be considered when [a] defense attorney … is in a non-marital relationship with the … bailiff that would raise concerns about the neutrality of the functions performed by the … bailiff." (*Id.* at fn. 1.)

The trial court expressed uncertainty as to whether the relationship between Miller and Gonzales rose to that level, distinguishing "parties to casual social contacts" from "those who are involved in a sustained dating relationship over a period of months" or are married. (See *People v. Jackson* (1985) 167 Cal.App.3d 829, 832.) The *Jackson* court cited *Cohn v. Rosenfeld* (9th Cir. 1984) 733 F.2d 625, 631, a federal case in which the alleged conflict "amounted to no more than incidental social contacts and a completely unrelated business transaction" between the defendant and a member of the law firm representing the plaintiffs. Here, during trial, one of defendant's attorneys engaged in a sexual relationship with a sheriff's deputy who was serving as a bailiff; was employed by the same sheriff's department that investigated the case; and knew a number of the prosecution witnesses. The nature of the relationship implicates many of the concerns raised by the State Bar in Formal Opinion No. 1987-93, and the relationship should have been disclosed to both defendant and the court.

On this record, it is unclear to what degree the potential conflict may have actually affected counsel's performance. Miller and Gonzales both testified that they did not discuss defendant or the case. Defendant points out that Miller cross-examined numerous sheriff's deputies who testified for the prosecution, but does not identify any specific deficiencies in her questioning of those witnesses. He also notes his poor attorney-client relationship with Miller, but the record indicates defendant refused to speak with *any* of his attorneys and the lack of communication well predated Miller's purported courtroom flirtation with Gonzales during trial. Connecting the undisclosed relationship and

defendant's other claims of ineffective assistance would be tenuous and unduly speculative. The potential conflict of interest is therefore not prejudicial when viewed in isolation. We observe, however, that the existence of the undisclosed relationship at a minimum may have affected counsel's focus during trial. That further undermines our confidence in the verdicts on counts 1 and 4, in light of counsel's performance deficits in other respects. (*In re Gay* (1998) 19 Cal.4th 771, 828.)

## C. RESENTENCING IS REQUIRED ON COUNTS 2 AND 3

We agree with the parties that punishment must be stayed on either count 2 or count 3 because those counts were based on the same act. (Pen. Code, § 654.) The Attorney General urges us to stay punishment on count 3, consistent with the trial court's apparent intent, rather than remanding for resentencing. But as resentencing on counts 2 and 3 will be appropriate on remand due to our reversal of the convictions on counts 1 and 4, we will allow the trial court to determine in the first instance whether to stay punishment on count 2 or count 3. Also as to those counts, we will allow the trial court to address in the first instance the potential applicability of Penal Code section 1170, subdivision (b)(6) (identifying circumstances for a presumptive lower term).

(Defendant also challenges the trial court's imposition of an upper term sentence for the firearm use enhancement on count 1, and argues that the enhancement should have been stricken. He further contends punishment must be stayed on either the count 1 enhancement or count 4. Given our conclusion that the convictions on those counts must be reversed, we do not reach those issues.)

## III. DISPOSITION

The judgment is reversed. The convictions on counts 1 and 4 are vacated, the true findings on count 1 are vacated, and the matter is remanded with instructions to resentence defendant on counts 2 and 3. Defendant may be retried on counts 1 and 4. The clerk of this court is directed to send a copy of our opinion to the State Bar, as required under Business and Professions Code section 6086.7, subdivision (a)(2).

24

_____
Grover, J.

**WE CONCUR:**



_____
Greenwood, P. J.




_____
Lie, J.




H050223
*People v. Sampognaro*