Filed 5/19/26  P. v. Brown CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JULIAN JASON BROWN,<br><br>        Defendant and Appellant. | C100991<br><br>(Super. Ct. No. 21FE020034) |

Defendant Julian Jason Brown participated in a drive-by shooting at a birthday party attended by rival gang members.  A bullet struck and killed Joseph Almanza.  At least four others were injured.

The People charged defendant and two codefendants, Anthony Smith and Eddie Young, all members of the Oak Park Bloods, with one count of first degree murder and five counts of discharging a firearm from a motor vehicle.  In a joint trial, a jury found defendant and codefendant Smith guilty on all counts.  The jury could not reach a unanimous verdict as to codefendant Young, and the trial court declared a mistrial as to him.  Regarding defendant, in a bifurcated proceeding, the trial court found various gang and firearm enhancement allegations to be true, and sentenced him to state prison for an indeterminate term of 75 years to life consecutive to a determinate term of 15 years.

1

Defendant now contends (1) the evidence is insufficient to support his convictions for murder and discharging a firearm, (2) the evidence is insufficient to support the jury's finding that the murder was committed with premeditation and deliberation, (3) the trial court erred in admitting two Instagram live videos and a separate Instagram post, (4) this court should review the sealed transcript of an in camera hearing conducted under Evidence Code[1] section 1042, and (5) he is entitled to additional presentence custody credit.

We conclude substantial evidence supports defendant's convictions and the finding of premeditation and deliberation. Defendant's evidentiary error claims are either forfeited or fail on the merits. And our review of the sealed transcript does not disclose an abuse of discretion. However, as the People agree, defendant is entitled to additional presentence custody credit. We will modify the judgment to award 863 days of presentence custody credit and affirm the judgment as modified.

BACKGROUND

In the summer of 2020, two groups of Sacramento gangs were at war. A gang detective described the violence as the worst he had seen in 20 years, "just shooting after shooting after shooting." The first group of combatants was the Oak Park Bloods and various subsets and allies of that gang. The second group was G-Mobb and their affiliated gangs, including the Del Paso Heights Bloods and the Meadowview Bloods. In addition to criminal activity, each group claimed the membership of an influential rapper. On the G-Mobb side was Donald Oliver, who went by Lavish D, and on the Oak Park Bloods side was Timothy Patterson, who went by Mozzy. The rap music aspect, which was central to the defense case, will be set forth in greater detail later in this background.

---

[1] Undesignated statutory references are to the Evidence Code.

2

On May 25, 2020, about two weeks before the deadly shooting, G-Mobb affiliated gang members, including Almanza, a Del Paso Heights Bloods member, were at Discovery Park. At least three Oak Park Bloods came to the park and fought with them. The fight was captured on video. Almanza stomped on the head of one of the Oak Park Bloods and the others ran away, but the next day they committed two retaliatory shootings. The second shooting targeted Khaalis Reid, a member of the Meadowview Bloods. One of the perpetrators had a cell phone screenshot from the Discovery Park fight video with Almanza centered in the picture, suggesting Almanza was also a target.

On June 6, 2020, Almanza and Reid went to a birthday party for Reid's younger brother. The party was at Reid's mother's duplex on Gardendale Road in the Meadowview neighborhood (the Gardendale house). Around 40 people were at the party, including Eugene Williams and Jackson Reed, who went by Quincy. Williams, a member of the Meadowview Bloods, lived at the Gardendale house. Jermaine Moore, who lived with the Reid brothers at a different location, was also at the party. He was a G-Mobb gang member. Almanza arrived at the party with Laquarius Edwards at around 7 p.m. Like Almanza, Edwards was a member of the Del Paso Heights Bloods. Tyriq George, an associate of the Meadowview Bloods, arrived around the same time. Less than 20 minutes later, while Almanza, Edwards, and George were talking outside the house, a silver Nissan Altima pulled up and opened fire.

A bullet struck Almanza in the abdomen, perforating the iliac artery and causing him to bleed to death. Bullets struck Edwards in the left thigh and groin area. George was shot in the right leg. Moore and Quincy were also in front of the house during the shooting. Moore was shot in the leg. Quincy was shot in the chest and neck.

N.D., who also lived at the Gardendale house, was sitting in the garage with the garage door open when the gunfire erupted. She estimated that over 20 shots were fired. The gunfire caused her to fall out of her chair. When she got up, she saw that Quincy had

3

been shot. N.D. did not see Almanza get shot, but knew he was hit because she saw people grabbing him and screaming his name.

Reid's mother, who was inside the house when the shots were fired, called 911. So did a passing motorist, B.B., who saw the shooting as it was happening. B.B. testified that the shots were fired by a black male, between the ages of 19 and 24, who was in the back seat behind the driver. The shooter was leaning out of the car as he fired the gun. Although she could not see his face, B.B. described the shooter as either having a dark complexion or wearing a dark mask.

Another witness to the shooting, T.G., was in a friend's driveway on the other side of the duplex, working on the underside of her car. When she heard the first shot, she ran inside the house. As she did, she saw a car in the middle of the intersection and the shooter, wearing a light gray hooded sweatshirt, firing several rounds from the back seat behind the driver. His arm and entire torso were out of the window as he fired. T.G. said he had dark skin, lighter than hers, but she could not offer any additional description. The driver was wearing a black hooded sweatshirt. Two other people were also in the car, although T.G. could not see anything other than shadow and head movement indicating their presence.

Police and paramedics arrived within minutes of the shooting. Edwards told an officer he thought there were two shooters based on how fast the shots were fired.

Police canvassed the area surrounding the shooting and collected surveillance video from two houses. In the minutes before the shooting, the videos showed three cars driving back and forth around the block in a seemingly coordinated fashion: the Altima, a Chevy Malibu, and a Toyota Rav4. At one point, the Altima and Malibu stopped for a moment and the occupants appeared to interact with each other.

Based on the surveillance videos, a detective searched footage from various license plate readers within the general area of the shooting. Three minutes after the shooting, an image of the Rav4 was captured on a license plate reader a short distance

4

away.  A records check of the license plate revealed the car belonged to a rental company.  It was rented the previous day by Esperanza Hatch's mother.  Defendant and Hatch were dating.

The Altima was captured by a different license plate reader about 14 minutes after the shooting, in an area consistent with the drive time to that location.  The image showed a bullet hole in the rear window.  The same car was captured on a different license plate reader about an hour before the shooting, with no bullet hole in that pre-shooting image.  A records check of the license plate revealed the car belonged to A.V.  She briefly dated Smith and loaned the car to him two or three days before the shooting.  Smith kept the car for four days.  He replaced the rear window during that time.

Although the Malibu was not captured on any license plate readers within the detective's search parameters, defendant owned a Malibu that matched the description of the car captured in the surveillance videos.  Based on a review of those videos, detectives identified Cristian Carrillo-Rivera as the driver.  He and defendant were close friends.  About a month before the shooting, defendant was pulled over with Carrillo-Rivera in the same car.  During the stop, they told officers they wanted to keep their faces covered because "they were in rival territory."

Based on cell phone call detail records, which provided the date and time of cell phone activity along with cell tower locations, detectives determined that defendant, Smith, and Carrillo-Rivera were in the general area of the shooting when it occurred.  At 5:36 p.m., Smith called defendant from the general area of the Gardendale house.  The birthday party had started, but Almanza had not yet arrived.  A short time later, defendant made a call to Carrillo-Rivera.  Defendant was in the Oak Park area and Carrillo-Rivera was in South Sacramento.  At around 6 p.m., Smith made two calls from an area just north of the Gardendale house.  At 6:10 p.m., defendant called Carrillo-Rivera.  About 10 minutes later, Carrillo-Rivera made two calls to defendant, who was now in the North Sacramento area, where he lived.  Carrillo-Rivera was still at his

5

previous location. At 6:25 p.m., Smith made another call from the same area just south of the Gardendale house. Around the same time, defendant, still in the area where he lived, received another call from Carrillo-Rivera.

At around 7 p.m., defendant called Carrillo-Rivera, who called him back three minutes later. Both defendant and Carrillo-Rivera were now in the general area of the Gardendale house. This is also about the time that Almanza arrived at the party. About 15 minutes later, within minutes of the shooting, Smith's phone connected to a cell tower in the same area. About three minutes after the shooting, defendant called Carrillo-Rivera again. They were still in the general area of the Gardendale house. At 7:24 p.m., about six minutes after the shooting, Smith's phone was now connecting to a cell tower north of the Gardendale house. Three minutes later, defendant again called Carrillo-Rivera. Defendant was now west of the Gardendale house. At 7:40 p.m., about 20 minutes after the shooting, Carrillo-Rivera called defendant from the general area of the license plate reader where the Altima was photographed. Defendant was now in the same area. Around that time, Smith's phone connected to cell towers just south of that area.

Forty-five expended shell casings were recovered from the shooting scene. Five firearms fired those rounds. Two 9-millimeter firearms fired a total of 12 rounds and three .40 caliber firearms fired a total of 33 rounds. Only one of the five firearms was recovered. A .40 caliber semiautomatic handgun was recovered about two months after the shooting during a traffic stop of a car driven by Ricardo Hall-Ramirez, a member of the Strawberry Manor Bloods, a gang allied with the Oak Park Bloods. Defendant and Hall-Ramirez communicated many times by direct message on social media during the months leading up to the shooting and afterward. The handgun recovered during the Hall-Ramirez stop had fired 15 of the shell casings recovered from the scene. Based on T.G.'s statement, those casings appeared to be the ones fired from the Altima. Among the casings was a laser sight that apparently fell off the gun while

6

firing.  DNA recovered from the laser sight matched a DNA sample taken from defendant.  The sample taken from the laser sight consisted of DNA from four contributors.  The largest contributor, 81 percent of the sample, matched defendant's DNA profile.  DNA was also recovered from the handgun and the magazine.  The results were inconclusive with respect to whether defendant's DNA profile matched the samples taken from those items.

On the afternoon of the drive-by shooting, Smith took a selfie of himself in the driver's seat of the Altima and posted it on Instagram.  Later that night, about four hours after the shooting, he sent a direct message to the mother of his children that said, " 'if anything happens to me, I love you all.' "  Social media interactions between defendant and Smith revealed their relationship to be very close.  They communicated frequently on Instagram.  In one message from Smith to defendant, sent six days after the murder, Smith wrote, "I'll do life" with exclamation points and a black heart emoji.

About eight months after Almanza's murder, defendant engaged with two rival gang members in separate Instagram live videos that were posted on YouTube.  The videos consisted of an exchange of insults.  In the first, defendant said to Williams, who was a member of the Meadowview Bloods and had been at the birthday party, "you [expletive] ain't slide for nobody.  You left [Almanza] roll in the grass [expletive].  Dead [expletive]."  In the second, defendant smoked a blunt while interacting with Deandre Franklin, who was a member of the Del Paso Heights Bloods.  Defendant's ashtray had a picture of Almanza's face in it.  Defendant put the blunt out in the ashtray and said, "I just put it out on [Almanza's] face."  Defendant also posted on Instagram, "pull up point n shoot fuck whoever die that's a gangmember point of view."

The prosecution's theory of the case was that defendant set up the drive-by shooting; defendant was the person T.G. and B.B. saw opening fire from the back seat; Smith drove the car during the shooting; and Young was in the car and also firing shots.

7

But defendant disputed his involvement in the drive-by shooting. His defense case consisted primarily of expert testimony. Professor Erik Nielson, an expert in rap music, testified for the defense that Mozzy was "probably the biggest [rap music] artist to come out of Sacramento." Mozzy's branding included merchandise with a "Hellgang" logo. Defendant was also an aspiring rapper who performed as "Murdagang Juju" and had merchandise with "Murdagang" branding. Defendant's Instagram account was similar to other aspiring rappers, but was "a little bit more advanced than some of the other artists" the professor had seen. His music videos were also "more advanced and sophisticated" than a typical aspiring artist and included "cinematography that was often very, very impressive." The professor thought defendant might have been on track to be the next big artist to come out of Sacramento. Mozzy included defendant in a few of his songs, and at least one of his rap videos, which received "millions and millions of views" online. Almanza was also an aspiring rapper who performed as "Jody Woah" and had "created something of a buzz in the Sacramento [hip hop] community."

Testifying about rap music generally, Professor Nielson explained: "So there are certain elements to this genre that do correspond with a person's lived reality. It's sort of like . . . historical fiction. The city really exists, some of the things happen, but many of the things that are layered on top are fictionalized or made up." Because of that, the professor opined that it is "dangerous to try to take something that's so obviously fictionalized and look for truth in it." The professor also described "diss tracks" and "battle rapping," and explained that "it is not uncommon for rappers to speak ill of fallen or dead rappers," although the practice is "controversial within the hip hop community, whether you ought to be doing that or not, but it is not uncommon."

Regarding defendant's "pull up point n shoot" Instagram post, Professor Nielson testified that it was "consistent with the kind of posturing that you see these artists doing all the time." As for the Instagram live videos, the professor testified that the behavior was consistent with "beefs between rappers" where "artists make rivals or pretend to be

8

rivals and have these exchanges, these heated exchanges, but they are often intended to be promotional or marketing for both of the artists." Williams and Franklin were also aspiring rappers and appeared in the live videos as G-Man and Dre Steez, respectively. The professor acknowledged that it was possible to be both a rapper and a gang member, and although the Instagram live videos were consistent with performance or marketing, it was possible that the things defendant said in the videos were true.

Defendant also adduced testimony from a defense gang expert, who disputed certain aspects of the prosecution's expert gang testimony, and a defense expert in analyzing call detail records, who provided his own interpretation of the movement of the cell phones following the shooting. In addition, defendant called an investigator who testified that the gun in a photo on Young's cell phone appeared to be the same gun recovered during the Hall-Ramirez stop.

Smith's defense case consisted primarily of his own testimony. He admitted being a member of the Oak Park Bloods, but claimed he contributed to the gang by rapping and supplying girls for prostitution rather than committing violent crime. Although Smith acknowledged borrowing A.V.'s car before the shooting, he denied driving the car during the shooting and denied being anywhere near the shooting scene. According to Smith, about four hours before the shooting, he drove the car to a park to play basketball with some fellow Oak Park Bloods. When he got there, fellow gang member Keyshawn Deams walked over to the car. As Smith was getting his basketball gear out of the back, Deams asked if he wanted to smoke marijuana and got into the driver's seat. Smith thought Deams was going to roll a joint in the car and then return to the basketball court, so Smith walked over to the court, leaving his cell phone in the car, and started playing basketball. When he looked up, Deams and the car were gone. Two or three hours later, Deams used Smith's cell phone to call someone Smith was with to let him know he had his phone. When Smith met up with Deams, the back window of A.V.'s car had a bullet hole in it.

9

Deams was shot and killed the day after the birthday party. The prosecution's rebuttal case included call detail records showing that Deams's cell phone was not near the Gardendale house at the time of the shooting. The prosecution's gang expert also testified that although snitching is generally frowned upon in gang culture, implicating a deceased gang member, such as Deams, in a murder would not be considered snitching.

We omit a recitation of the evidence adduced during the bifurcated trial on the gang allegations as this appeal does not raise any issues related to that part of the proceedings.

DISCUSSION

I

Based on the drive-by shooting that ended Almanza's life and injured four others, the jury found defendant guilty of one count of murder and five counts of discharging a firearm from a motor vehicle. Defendant claims the evidence is insufficient to support any of those convictions.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] Our review must presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might reasonably be reconciled with the defendant's innocence. [Citations.] It is the duty of the jury to acquit the defendant if it finds the circumstantial evidence is susceptible to two interpretations, one of which suggests guilt and the other innocence. [Citation.] But the relevant inquiry on appeal is whether, in light of all the evidence, '*any* reasonable trier of

10

fact could have found the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)

Murder is "the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).) Malice may be express or implied. (Pen. Code, § 188.) "It is express 'when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature,' i.e., an intent to kill unlawfully. [Citations.] It is implied 'when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger.' [Citations.]" (*People v. Parker* (2025) 113 Cal.App.5th 1261, 1267.)

The crime of discharging a firearm from a motor vehicle has the following elements: willful and malicious discharge of a firearm, from a motor vehicle, at another person other than an occupant of a motor vehicle. (Pen. Code, § 26100, subd. (c).) This crime does not require any specific intent, but rather only the general intent to do the proscribed act, i.e., the discharge of the firearm from the motor vehicle at another person outside the vehicle. (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.)

Defendant notes that the jury was instructed on three theories of liability for the crimes: direct perpetrator, aiding and abetting, and conspiracy to commit the charged crimes. He argues the evidence does not support any of those theories. Of course, if there is substantial evidence supporting at least one theory, the verdict must be upheld. (*People v. Silva* (2001) 25 Cal.4th 345, 370.) We conclude substantial evidence supports the aider and abettor theory and therefore need not address the direct perpetrator or conspiracy theories.

Whoever fired from the Altima, killing Almanza, committed the crimes of murder and shooting from a motor vehicle. Defendant does not argue otherwise. And if defendant (1) knew of the shooter's unlawful purpose, (2) intended to commit, encourage, or facilitate the crimes, and (3) by act or advice aided, promoted, encouraged,

11

or instigated their commission, then defendant is guilty as an aider and abettor. (Pen. Code, § 31; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118.)

" 'Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal responsibility. [Citation.] Likewise, knowledge of another's criminal purpose is not sufficient for aiding and abetting; the defendant must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime.' " (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272-273.) In addition to presence at the scene of the crime and failure to prevent it, the jury may also consider " 'companionship, flight, and conduct before and after the crime.' " (*Id*. at p. 273.) "Motive is another circumstance to be considered in determining aiding and abetting liability." (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599.)

Here, the evidence supports a reasonable conclusion that defendant, in communication with Smith and Carrillo-Rivera, participated in orchestrating the convergence of the three vehicles: the Altima, driven by Smith; defendant's Malibu, driven by Carrillo-Rivera; and the Rav4 that had been rented by the mother of defendant's girlfriend. Immediately before the shooting, those cars drove back and forth around the block; the occupants of the Altima briefly conferred with Carrillo-Rivera in the Malibu; and then the Altima pulled up to the Gardendale house and opened fire. Cell phone call detail records confirm that defendant, Smith, and Carrillo-Rivera were in the area of the Gardendale house at the time of the shooting. Defendant, Smith, and Young, members of the Oak Park Bloods, had a motive for committing the drive-by shooting, as members of rival G-Mobb gangs were at the house and Almanza in particular had recently stomped on a fellow Oak Park gang member during a fight at Discovery Park. Defendant was close friends with Smith and Carrillo-Rivera.

12

The gun that fired 15 rounds from the Altima was recovered during a traffic stop two months later. Defendant's DNA was not on the gun, but a picture of the gun was found on Young's cell phone. A laser sight was attached. That laser sight was recovered from the shooting scene among the 15 shell casings fired by the gun. Defendant's DNA was on the laser sight. Even if defendant was not the shooter, the jury could have reasonably concluded that he, at the very least, handled the gun while the laser sight was attached before the shooter opened fire. A reasonable jury could also have inferred that even if defendant was not the shooter, he was not in his own car at the time of the shooting, he had moved instead to be with the shooter who leaned out from the Altima. Such an inference flows from the evidence that defendant's DNA was on the laser sight, his Malibu was on the block that night, Carrillo-Rivera was driving defendant's Malibu, and four people were in the Altima.

Defendant fled from the scene. And his subsequent social media activity supports a reasonable inference that he shared the shooter's intent to shoot and kill rival gang members that night. On social media defendant mocked Almanza, put a blunt out on a picture of Almanza's face, mocked Williams for letting Almanza "roll in the grass," and also posted: "pull up point n shoot fuck whoever die that's a gangmember point of view." The evidence supports a conclusion that defendant is guilty as an aider and abettor.

Nevertheless, defendant argues "[p]resence at the scene and companionship with the perpetrator were contradicted by unrefuted expert testimony." In support of this argument, defendant points to evidence that Smith's phone was the first to travel north of the Gardendale house after the shooting while defendant's phone (and Carrillo-Rivera's phone) remained closer to the shooting scene. Their phones were also not in the same general area about an hour before the shooting. But all that shows is that Smith and defendant arrived in the area of the shooting in separate cars and left the area after the shooting in separate cars. It does not refute the possibility that defendant, after arriving

13

in the area in his Malibu, got into the Altima with Smith and Young, and then afterward, got back into his Malibu before leaving the area. Defendant argues such an inference "is implausible, requiring a belief in a high-risk passenger swap without any evidentiary trace." However, we have already set forth the evidence supporting a reasonable inference that defendant was in the Altima when the shooting happened. The fact that he would have had to get out of his car and into Smith's car for that to be true does not make the inference implausible. Indeed, the fact that Carrillo-Rivera was driving defendant's car in the surveillance video supports a conclusion that defendant was somewhere else, i.e., in the Altima, when it pulled up and opened fire.

Defendant characterizes "[t]he theory that [he] orchestrated lookout cars" as "speculative" because the content of the phone calls between defendant, Smith, and Carrillo-Rivera "is unknown." However, the fact of the calls, as well as the movement of the cell phones, the arrival of the Altima, Malibu, and Rav4 on the block, their seemingly coordinated movements and interactions between the occupants captured on surveillance video, all support a reasonable inference that defendant participated in orchestrating their arrival for the purpose of committing the drive-by shooting. He need not have specifically told anyone to act as a lookout.

Defendant further asserts that he did not supply the Altima, from which shots were fired, or the gun that fired those shots. However, defendant need not have supplied either the car or the gun to have aided and abetted the drive-by shooting. "The 'act' required for aiding and abetting liability need not be a substantial factor in the offense." (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743.) Indeed, supportive presence can be enough. (*Id*. at p. 744.) Here, as we have already explained, the evidence supports a reasonable inference that defendant was not only present in the Altima and generally supportive of committing a drive-by shooting as a gang member, but he participated in orchestrating the convergence of the cars on the block that night, was either the shooter himself or present in the Altima with the shooter, handled the gun, failed to take action to

14

prevent the shooting, fled from the scene, and mocked Almanza's death afterwards. The evidence is sufficient.

Finally, defendant attempts to minimize the importance of his DNA being on the laser sight by arguing that his handling of the sight is "untethered in time and context from the crime." But again, on appeal, it is not enough that a different factual scenario can be envisioned. For reasons already expressed, we conclude this evidence, in combination with all of the evidence, supports a finding that defendant aided and abetted the drive-by shooting and murder.

II

Defendant separately challenges the sufficiency of the evidence supporting the jury's finding that the murder was committed with premeditation and deliberation.

" 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation . . . does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) The statute itself states that a finding of deliberation and premeditation does not require the defendant to have "maturely and meaningfully reflected." (Pen. Code, § 189, subd. (d).)

The California Supreme Court has "established 'guidelines to aid reviewing courts in analyzing the sufficiency of the evidence to sustain findings of premeditation and deliberation.' [Citation.]" (*People v. Williams* (2018) 23 Cal.App.5th 396, 409-410 (*Williams*).) In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the court noted that three types of evidence have been held sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, (2) motive to kill the victim, and (3) manner of killing

indicative of a preconceived design to kill. (*Id*. at pp. 26-27.) The court explained that "this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id*. at p. 27.)

However, *Anderson* "did not change the definition of murder or establish elements that had to be proven in each case . . . . 'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' [Citations.] . . . [T]he factors do not impose a 'straitjacket on the manner in which premeditation can be proven adequately at trial.' [Citation.]" (*Williams, supra*, 23 Cal.App.5th at pp. 410-411.)

Nevertheless, we find the *Anderson* framework to be useful in this case. As we have already explained, there is ample evidence that defendant had a gang-related motive to kill Almanza. (See *People v. Romero* (2008) 44 Cal.4th 386, 401.) The manner of killing is also indicative of a preconceived design to kill. The Altima pulled up to the Gardendale house and slowed down, allowing the shooter to open fire on Almanza and other rival gang members in front of the house. Such a killing is not indicative of a " 'mere unconsidered or rash impulse hastily executed.' " (*Anderson, supra*, 70 Cal.2d at p. 27.) There was also evidence of planning activity. There were phone calls between defendant, Smith, and Carrillo-Rivera leading to the arrival of the Altima, defendant's Malibu, and the Rav4 on the block; the cars drove in a coordinated manner around the block; at least one occupant of the Altima was armed when they arrived; and there was a consultation between the occupants of the Altima and the Malibu immediately before the drive-by shooting. (See *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1208 [evidence of planning where gang members armed themselves before a party and parked around the block].) Together, the evidence is sufficient to support the jury's finding of deliberate and premeditated murder.

16

Defendant argues that "[t]he evidence, at most, supports a finding of a spontaneous and impulsive act by the shooters, not a carefully weighed plan in which [defendant] participated." However, aside from this one line in defendant's conclusion, his argument does not specifically dispute that the *Anderson* factors are satisfied with respect to anyone who aided and abetted the murder and drive-by shooting. As we have explained, there is evidence of all three factors. Instead, defendant reasserts that he was absent from the crime scene, his DNA's presence on the laser sight was untethered and ambiguous, and his social media posts and evidence of generalized gang dynamics did not establish that he personally intended to kill anyone. However, we have already concluded that defendant aided and abetted Almanza's murder and the drive-by shooting that injured four others. We now also conclude the evidence supports a finding that he did so with a deliberate and premeditated intent to kill.

### III

In addition, defendant contends the trial court erred in admitting the Instagram live videos and a separate related Instagram post, apparently the "pull up point n shoot" post. His briefing, however, argues this contention only with respect to the live videos. Any contention that the separate post was improperly admitted is therefore forfeited. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

### A

Prior to trial, the prosecution sought to introduce defendant's social media posts, rap videos and lyrics, and two Instagram live videos. The relevant content from the live videos is the following. In the first video, defendant said to Williams, "you [expletive] ain't slide for nobody. You left [Almanza] roll in the grass [expletive]. Dead [expletive]." Defendant also said: "Went and picked TG up [expletive]" and "took him to the hospital [expletive]." "TG" refers to Tyriq George, who was shot while talking to Almanza and taken to the hospital by someone at the party. In the second video, while

17

interacting with Franklin, defendant put a blunt out in an ashtray that had a picture of Almanza's face in it. He then said, "I just put it out on [Almanza's] face."

Defendant moved to exclude any rap videos, lyrics, and related Instagram live videos under sections 352 and 352.2. Regarding the live videos, which were described as "promotional performances" and "battles with other local rappers," defendant argued they should be excluded under section 352 because their prejudicial effect outweighed any probative value. Defendant also argued they should be excluded under section 352.2 as " 'a form of creative expression' " subject to a "very unique balancing test . . . that has a much greater balance toward the exclusion of this evidence."

Addressing the artistic nature of the Instagram live videos, defendant noted that he appeared under his stage name, as did the other rappers, and the live videos had hundreds of viewers who interacted with the content by leaving comments that the performers could respond to in real time. Defendant claimed there was no factual basis to believe the live videos were anything other than an artistic performance. As for probative value, he argued the live videos occurred more than six months after the offense and did not include any statements about the offense that were previously unknown. Although he mentioned Almanza's murder in one of the videos, defendant pointed out that other commenters did too, Almanza was a locally famous rapper, and defendant never took credit for the shooting or claimed to be responsible. Defendant argued "the verbiage and imagery utilized in these performances would be highly prejudicial and it would fall directly into the area of exclusion that has been clearly set out in . . . section 352.2."

At the hearing on the motions, the trial court noted that the proffered evidence was relevant to the issues of motive and intent, but its admissibility would be subject to "measuring probative value against possible prejudice," including "assessing it under . . . section 352.2." The trial court ultimately excluded a rap video depicting defendant and other Oak Park gang members rapping and acting out a drive-by shooting, but admitted the two Instagram live videos. The trial court described the live videos as

18

"videotaped yelling matches" and questioned "whether they fall within the borders of [section] 352.2's definition of creative expression."  Nevertheless, the trial court ruled the probative value was not substantially outweighed by the danger of undue prejudice regardless of whether it was assessed under section 352 alone or with the added requirements of section 352.2.

B

Section 352 "requires the trial court 'to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption.'  [Citation.] The trial court excludes the evidence if these dangers substantially outweigh the evidence's probative value."  (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1154.) A more recent law, section 352.2, "calls for a particularized inquiry when the admissibility of a creative expression is challenged under . . . section 352."  (*People v. Aguirre* (2025) 18 Cal.5th 629, 687 (*Aguirre*).)  Section 352.2 applies in criminal proceedings "where a party seeks to admit as evidence a form of creative expression," and requires the trial court to "consider . . . that:  (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will . . . treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings."  (§ 352.2, subd. (a).)  We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Robinson* (2020) 47 Cal.App.5th 1027, 1030.)

Defendant argues the trial court abused its discretion by (1) "failing to recognize that the evidence fell exclusively within the definition of 'creative expression,' " (2) "finding high probative value where the law presumes it is minimal,"

and (3) failing "to properly weigh the undue prejudice," i.e., "the specific risks of propensity reasoning and racial bias."

Section 352.2, subdivision (c) "defines a ' "creative expression" ' as 'the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media.' [Citation.]" (*Aguirre, supra*, 18 Cal.5th at p. 687.) The trial court questioned whether the Instagram live videos fit this definition, describing them as "videotaped yelling matches." This court has not been provided with the actual exhibits containing the videos. Without viewing them, we are in no position to question the trial court's description. And the transcripts, which we have been provided, support that description. The relevant statements made by defendant in the live videos do not appear to be a part of any rap battle. Instead, the transcripts support a conclusion that defendant and two rival gang members, as well as other unidentified males, exchanged insults over social media, some of which referred to this particular drive-by shooting and Almanza's murder. We accept for purposes of analysis that defendant, Williams, and Franklin, in addition to being gang members, were also rappers. But that does not make everything they say to each other creative expression within the meaning of section 352.2.

Nevertheless, because the trial court assessed admissibility under both section 352 and section 352.2, we need not determine whether the Instagram live videos qualify as creative expression. Even if they do, the trial court did not abuse its discretion in admitting the evidence under section 352.2.

Contrary to defendant's argument on appeal, section 352.2 does not contain a general presumption that the probative value of any creative expression will be minimal. The statute specifically states that "the probative value of such expression *for its literal truth or as a truthful narrative* is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime

20

or crimes, or includes factual detail not otherwise publicly available." (§ 352.2, subd. (a), italics added.) The relevant statements in the Instagram live videos were not admitted for their literal truth or as a truthful narrative. They were admitted to show a gang-related motive and intent to kill. "[E]vidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable." (*People v. Roldan* (2005) 35 Cal.4th 646, 707, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Moreover, defendant's statements in the first live video clearly indicate that he was talking about the drive-by shooting and murder, referring to Almanza by name and also mentioning that George was picked up and taken to the hospital. But again, defendant's statements were not admitted for their truth. They were admitted to prove motive and intent. On those issues, the probative value was high notwithstanding the existence of other gang evidence.

Turning to the undue prejudice side of the balancing test, "[t]his court has noted that ' "[t]he prejudice which exclusion of evidence under . . . section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*.' " [Citations.]' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 167 (*Holford*).) The challenged videos were prejudicial both because they were highly probative of defendant's motive and intent to kill and because of the potential for the jury to improperly use propensity reasoning and the sort of racial stereotypes that section 352.2 was enacted to prevent. However, the latter form of prejudice requires exclusion only if "the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice . . . ." (*Holford,* at p. 167.)

The trial court conducted the required balancing and concluded the probative value was not substantially outweighed by the danger of undue prejudice. That was not an abuse of discretion. (See *People v. Lawson* (2025) 108 Cal.App.5th 990, 1003 [Instagram posts claimed to be rap lyrics were highly relevant to the defendant's motive and not inadmissible under section 352.2]; *People v. Zepeda* (2008) 167 Cal.App.4th 25, 35 [admission of rap lyrics written by the defendant to prove his state of mind was not an abuse of discretion].)

"Having concluded that the trial court did not abuse its discretion under section 352 [or section 352.2], we must also reject defendant's argument that he was deprived of his constitutional right to a fair trial. ' "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." ' [Citations.]" (*Holford, supra*, 203 Cal.App.4th at p. 180.) Notwithstanding the admittedly prejudicial nature of the challenged evidence, it was nevertheless highly relevant evidence on a critical issue in this case, defendant's motive and intent. Admission of the evidence did not render defendant's trial fundamentally unfair.

IV

Defendant also asks this court to review the sealed transcript of an in camera hearing conducted under section 1042. The People do not object to this request.

Section 1041 "grant[s] the People a privilege not to disclose, and to prevent others, such as defendant, from disclosing, the identity of a confidential informant. (§ 1041, subd. (a).) The People may claim this privilege after establishing disclosure 'is against the public interest because the necessity for preserving the confidentiality of [the informer's] identity outweighs the necessity for disclosure in the interest of justice.' (§ 1041, subd. (a)(2).)" (*People v. Bradley* (2017) 7 Cal.App.5th 607, 620 (*Bradley*).) "When weighing the necessity to keep an informant's identity confidential against the necessity for disclosure in the interest of justice, a trial court must order the prosecution

22

to disclose the informant's identity and his location, or suffer dismissal of the case, if the informant is shown to be a material witness. [Citation.] 'An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant. [Citation.]' [Citation.] A trial court does not abuse its discretion denying the motion to disclose where 'the record demonstrates, based on a sufficiently searching inquiry, that the informant could not have provided any evidence that, to a reasonable possibility, might have exonerated defendant.' [Citation.]" (*Id*. at p. 620.)

"The trial court determines an informant's materiality pursuant to procedures provided by section 1042. That statute requires a court to convene a hearing outside the presence of the jury on a party's demand for disclosure of an informant's identity. If, during the hearing, the People claim the nondisclosure privilege or a person authorized to claim the privilege refuses to answer any questions because the answer might disclose an informant's identity, the prosecution may request the court to convene an in camera hearing. At that hearing, the prosecution may offer evidence that discloses the informant's identity 'to aid the court in its determination whether there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial.' (§ 1042, subd. (d).)" (*Bradley, supra*, 7 Cal.App.5th at pp. 620-621.)

Here, the prosecution's gang expert testified generally about drive-by shootings based on his conversations with gang members. During cross-examination, he was asked whether he spoke to any gang members who had participated in a drive-by shooting. The detective said he had. Asked who, the detective responded: "I'm not going to put their name out on the record." The matter was discussed outside the presence of the jury. Following a break in the proceedings, the trial court stated that it would conduct an in camera hearing under section 1042. The detective was then brought back into the courtroom, still outside the presence of the jury, and asked the question

23

again.  He invoked the foregoing privilege.  The trial court held the required in camera hearing, after which it denied the request for disclosure.  The jury was brought into the courtroom and instructed that the detective's refusal to answer was consistent with a privilege of nondisclosure and that the jury could not consider the refusal for any purpose.

"We review the trial court's ruling for an abuse of discretion."  (*Bradley, supra*, 7 Cal.App.5th at p. 621.)  Having reviewed the sealed transcript, we conclude the trial court engaged in a sufficiently searching inquiry, from which it reasonably concluded that two informants, who provided the detective with general information about how drive-by shootings are carried out, could not have provided any evidence that, to a reasonable possibility, might have exonerated any of the defendants.  There was no abuse of discretion.

V

Defendant's final claim is that he is entitled to additional presentence custody credit.  The People agree, and we do too.  Defendant was entitled to credit against his sentence for all actual days of presentence custody, beginning on the day of his arrest and continuing through the day of sentencing.  (Pen. Code, § 2900.5; *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.)  Defendant was taken into custody in Nevada on December 9, 2021, held there until December 21, 2021, after which he was transported to Sacramento County, where he was held until sentenced on April 19, 2024.  The total time was 863 days.  The trial court awarded 851, apparently omitting the days spent in custody in Nevada.  We will modify the judgment to reflect an award of 863 days.

DISPOSITION

The judgment is modified to award defendant 863 days of presentence custody credit.  The judgment is affirmed as modified.  The trial court is directed to amend the abstract of judgment to reflect the modification and to forward a certified copy

of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

/S/
MAURO, J.

We concur:

/S/
EARL, P. J.

/S/
KRAUSE, J.

25